UNITED STATES of America,

v.

St. Julian HARRISON, also known as Harry Martin, also known as Harry Walters, also known as Harry Harrison, Defendant.

No. 65 Cr. 343.

United States District Court
S. D. New York.

Feb. 2, 1967.

J. Edward Meyer, III, Asst. U. S. Atty., for the Government.

Louis Bender, New York City (Lloyd A. Hale, New York City, of counsel), for defendant St. Julian Harrison.

### MEMORANDUM

TYLER, District Judge.

In April, 1965, an indictment was returned against St. Julian Harrison charging him with income tax evasion. The indictment charges that his tax returns for the years 1958 and 1959 understated his income and alleges a total evasion of over $11,000 for the two tax years in question. Harrison now makes three motions addressed to the indictment: (1) for the suppression of certain materials and statements and dismissal of the indictment, (2) for a bill of particulars; and (3) for discovery and inspection.

### I.

#### The Motion to Suppress

The charges in the indictment grow out of the following sequence of events as related in large part by the prosecutor in his opposing affidavit. On February 8, 1960, at approximately 8:00 in the evening, some New York City police officers came to Harrison's home and suggested that he accompany them to the station house for questioning. Harrison's name apparently had been found in the possession of a police officer who had been charged with a narcotics violation. The police wanted to question Harrison about his possible involvement in narcotics violations. Harrison, who was then a parolee of the State of New York, accompanied the officers to the station house as requested.

In response to some preliminary questions, Harrison denied any knowledge of or participation in the narcotics traffic. When asked to produce some identification, Harrison produced a driver's license and registration bearing the name "Har-ry Walters". He then answered further questions which, with his answers thereto, were stenographically recorded. Specifically, Harrison was asked questions relating to his possible involvement in narcotics and policy operations; his ownership of cars and real estate; his filing, and failure to file, income tax returns; and his failure to include his policy earnings in his reported income. At no time was he advised of his rights to remain silent and to consult with a lawyer.

After the questioning, at about 1:00 in the morning, Harrison was taken to his candy store; the store was searched, and a number of policy slips and other gambling materials were found hidden behind a radiator. He was then taken back to the police station, arrested and charged with false statements on his driver's license and registration, and with a policy violation.

These charges were subsequently dismissed; the recorded statement and the gambling material were turned over to the Internal Revenue Service by the New York City police. Thereafter Harrison was confined in Dannemora State Prison for violation of the conditions of parole imposed upon an earlier conviction and sentence for an unrelated offense.

In March, 1961, while at Dannemora, Harrison was interviewed by an agent of the Internal Revenue Service. He was asked and apparently freely answered questions about his income, assets and expenditures, about his filing of tax returns and about what income was or was not recorded. Again, however, he was not advised of his constitutional rights prior to the questioning.

Harrison, therefore, moves to suppress the recorded statements made to the New York City police, the gambling materials seized from his candy store and the oral statements given to the Internal Revenue agent while in custody at Dannemora.

A. The recorded statements and wagering materials obtained by the New York City police.

██ Although federal agents concededly played no part in obtaining these

items, the statement and the policy slips are inadmissible in a federal criminal trial if the method by which they were obtained violated Harrison's constitutional rights. See Elkins v. United States, 364 U.S. 206, 4 L.Ed.2d 1669 (1960).

■ The government's contention that the statement was properly taken and the wagering materials were legally seized breaks down into two major premises. First, it is said that Harrison voluntarily appeared in the station house and submitted to questioning. Second, the prosecution urges that information gleaned largely, if not entirely, from the interview engendered "probable cause" for the officers' search of Harrison's store. Unfortunately, I am unconvinced by the first premise or argument; rather, I find that the totality of circumstances as stated in the prosecution's version of what transpired at the station house amounted to "custodial interrogation", as that term is defined in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). Custodial interrogation was there said to be:

"* * * questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." at p. 444, 86 S.Ct. at p. 1612.

The government concedes that Harrison was never advised of his constitutional rights prior to the taking of the "Q and A" statement. Since defendant was not warned, the recorded statement obtained as a result of the interrogation of February 8, 1960, may not be used against him at trial. Miranda v. State of Arizona, supra, at 479, 86 S.Ct. 1602.

■ In respect to the materials seized at Harrison's store, there can be no doubt, and the government here effectively concedes, that the police officers were impelled to search the apartment as a result of the questioning of Harrison at the station house. The seizure is thus the direct result of the unlawful questioning; everything that was taken, therefore, is inadmissible at trial. Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**B. The statements to the Internal Revenue Service agent.**

■ As indicated, Harrison was in Dannemora State Prison when interviewed by an Internal Revenue Service agent. Although perhaps not a usual and typical post-arrest situation, the interview in my opinion, cannot be sensibly viewed as anything but another instance of "custodial interrogation". (see p. 662 supra). As no warnings were given by the agent to Harrison, no evidence obtained from the questioning may be used against him. Miranda v. State of Arizona, supra, 384 U.S. at 479, 86 S.Ct. 1602.

## II.

### The Motion to Dismiss the Indictment

■ In spite of the foregoing rulings, it may well be that the government has ample, independent evidence with which to prove the charges in the indictment. Therefore, the motion to dismiss the indictment is denied.

## III.

### Demand for Particulars

In appraising defendant's numerous demands for particulars, it is significant to note that the government in its answering papers has disclosed its intention to proceed upon a net-worth theory of prosecution. It must also be recognized that, so far as is known, defendant kept no significant "business records" for the tax years in question. In the light of these two considerations, defendant's demand for particulars is disposed of as and for the reasons hereinafter indicated:

■ 1. Request No. 1 is granted; in addition the government will here be required to set forth

(a) The opening and closing net-worths for each tax year in question, and

(b) the date, payee, amount and manner of payment of any expenditures claimed.

2. Requests Nos. 2 through 6 are denied as being irrelevant and unnecessary.

3. Requests Nos. 7 and 8 are denied as being answered sufficiently by the indictment allegations.

4. Request No. 9 is denied because it requests matters outside of the scope of a proper bill of particulars.

5. Request No. 10 is granted except to the extent that it seeks "the items claimed to constitute said net worth at each such period, the additions and subtractions claimed to have occurred during each such year".

6. Requests Nos. 11 through 14 are denied. In view of the ruling of this court respecting Request No. 1, most of the information sought in Requests Nos. 11 through 14 becomes unnecessary. The remaining particulars requested are largely evidentiary in nature and, as such, are not properly to be disclosed prior to trial.

### IV.

*Motion to Inspect and Copy*

Defendant, pursuant to Rules 16 and 17(c), F.R.Crim.P., has moved for leave to inspect and copy voluminous records and papers allegedly in the possession or control of the government. Most of these materials are described with particularity in a *subpoena duces tecum* served upon the United States Attorney by counsel for defendant. See Rule 17(c), F.R.Cr. P.

In view of this court's rulings hereinabove on defendant's motion to suppress and the prosecution's declared intention to proceed upon a net-worth theory, Harrison is in a poor position to show that inspection and copying of most of the documents described in his papers are material to the preparation of his defense. Without extended discussion, therefore, the motion is denied and the *subpoena duces tecum* is quashed, except with respect to the following books and records:

(1) Those records described in subparagraphs (a) through (c) of paragraph 6 of the affidavit of J. Edward Meyer III, Assistant United States Attorney, verified on November 21, 1966;

(2) The 1958 and 1959 tax returns of defendant, which may be inspected and copied; and

(3) The "Q and A" statement taken from defendant by the New York City Police Department on or about February 8, 1960. See Rule 16(a) (1), F. R.Cr.P.

Inspection and copying of the above-described records shall take place at the office of the United States Attorney at a date and time to be agreed upon by counsel within thirty (30) days of the date of this memorandum.

One remaining item of defendant's demand for inspection deserves special consideration under the somewhat unusual circumstances presented by this case. In paragraphs "7" and "10" of his subpoena, defendant has asked for any statements obtained from him and any recordings or transcripts of "conversations" to which he was a party. The government has opposed these items; specifically, the government responds by admitting that it has in its control or possession only two "records" which fit in the described categories. One, of course, is the "Q and A" transcript of February 8, 1960, which has been ruled upon heretofore. The second is described by the government as "an interview sheet" prepared by the Internal Revenue agent when he questioned Harrison at Dannemora in March, 1961. I cannot agree that this document is "irrelevant" to this prosecution, nor do I regard as dispositive the government's representation that it does not intend to offer this document into evidence at trial. The serious question is whether or not this interview sheet falls within the exclusionary language of Rule 16(b), F.R.Cr.P. In other words, the government may be on firmer ground when it suggests that this document fits within the unavailable category of " * * * reports, memoranda, or other internal government documents * * * " made by government agents in connection with investigation and prosecution of a criminal case. On the

other side of the coin, however, the peculiar circumstances of the prison interview and the other unusual features of this case constrain me to surmise that the interview sheet in question might more fairly and appropriately be considered a written statement of the kind permitted for inspection by the provisions of Rule 16(a) (1), F.R.Cr.P.

To resolve this remaining issue, I regard it necessary and desirable for the court to inspect the interview sheet *in camera*. Accordingly, the United States Attorney is directed to deliver this document to me for such inspection and final ruling within five (5) days of the filing of this memorandum.

It is so ordered.