David T. Gibbons, J.
In this hearing to suppress the alleged confessions of two youthful offender defendants charged with the burglary of the golf pro shop at the Bethpage State Park on April 20, 1967, the court makes the following findings of fact and conclusions of law.
A detective connected with the Long Island State Park Police, who had been assigned to this case, testified that in the course of his investigation, his first contact with the defendant, B, was on July 12, 1967, several months after the alleged burglary, when he visited the latter’s home.
On the occasion of this visit the defendant was there in the presence of his mother and his father. The detective identified himself as a detective and proceeded to give him the Miranda warnings (384 U. S. 436). The defendant B responded with the answer, “ I would like to have a lawyer
*793 The detective’s version of what transpired after defendant B’s demand for the aid of counsel, as revealed by his testimony at the prior felony hearing, which he confirmed here to be a true report of what happened on this encounter of July 12, 1967, is as follows:
“ A. Then his father came into the conversation and he advised me that if he got all the stuff back and tve approached the pro at the club house and he wouldn’t start a complaint, that he would have all the stuff back and what he didn’t get back, he would reimburse some way or another.” (Emphasis added.)
‘‘ Q. Who said this? ’’ “ A. Mr. B.”
At this Huntley (People v. Huntley, 15 N Y 2d 72)-Miranda (supra) hearing herein, when questioned with respect to such prior testimony, the witness confirmed its truth, as follows:
“ Q. Well, now according to your testimony on the 31st of July, 1967, all that happened on the first day, didn’t it?” “ A. That’s correct.”
Where such prior testimony is affirmed as true by the witness, it is deemed affirmative evidence in chief. (United States v. Borelli, 336 F. 2d 376, 391 [1964]; Zimberg v. United States, 142 F. 2d 132, 136, cert. den. 323 U. S. 712; Finnegan v. United States, 204 F. 2d 105, cert. den. 346 U. S. 821; Harman v. United States, 199 F. 2d 34, 36; Stewart v. Baltimore & Ohio R. R. Co., 137 F. 2d 527, 529; Jenkins v. 313-321 W. 37th St. Corp., 284 N. Y. 397,402.)
The detective asked no more questions of this defendant but left the premises with the boy’s father and proceeded with him to the pro shop at the Bethpage State Park.
The next encounter between the detective and the defendant B was two days later, July 14, 1967, when the detective and a partner revisited his home, where they met the defendant and his father on the patio in the back yard.
The detective testified that he again gave the young man the Miranda warnings and that at that time the defendant said he did not want a lawyer. The interrogation was then continued and B made an alleged inculpatory statement. He offered to get the stolen equipment back and at the same time he implicated the defendant S as being also involved in the alleged burglary.
When he was questioned as to whether he had any conversations with the defendant B between the time he left B at his home on July 12 and his return 2 days later on July 14, the detective said, “ No, just his father.”
A later question directed to the detective on cross-examination as to whether the defendant on July 12 requested him to return, was answered in the affirmative. He said that such request was *794 made by the defendant, B. The detective testified, “I was invited also by young B to come back in two days, that they would have the equipment for me ”. From these conflicting versions, the court finds that on July 12, 1967, the defendant B did not request that the detective return.
After leaving the B residence on July 14, the detective and his partner proceeded to the place of business in Farmingdale where the defendant S was employed. They arrived at about noon and found that S was out for lunch. They waited for him. When he returned at about 1:00 p.m. he was called to his employer’s employment office at the request of the detectives, where he was interrogated in the presence of the company’s public relations officer. He was there given the Miranda warning, including his right to counsel, and at this time the detective told him that B had implicated him.
In response to this, the defendant S said, “he would like to see a lawyer or speak to someone else ”. The detectives did not leave. The detective said S wanted a couple of hours to speak to someone. When asked whether he then left, the detective said, “ No, I didn’t leave * * * I stayed there and he punched out ’ ’.
8 ‘ ‘ punched out ’ ’ and left his place of employment in midday in the company of the two detectives, and was driven to the B residence in the rear of the police car.
Upon their arrival at B’s home, S said he would like to speak to B privately. The two detectives and B’s father waited until the two boys finished their private conversation. At this point the detective advised both boys of their rights as required by Miranda v. Arizona (384 U. S. 436). 8 said he did not want a lawyer. S then proceeded to describe the manner in which the two boys burglarized the pro shop. B furnished additional details and both boys then promised to return the stolen property. The detectives left the B residence without making an arrest and returned again five days later on July 19. On this occasion B again refused to answer any questions, stating that he had a lawyer. He was then placed under arrest. The detective then proceeded to S’ place of employment where he was also placed under arrest. S’ family was advised of this, and both boys were then taken in for arraignment.
After considering all of the facts and circumstances surrounding the alleged inculpatory statement attributed to the defendant B, it is the court’s conclusion that it was obtained by such unfair and prejudicial methods as to constitute a gross violation of his rights under the Fourteenth Amendment of the Constitution of the United States. (Davis v. North Carolina, 384 U. S. *795 737; Payne v. Arkansas, 356 U. S. 560, 567; People v. Levra, 302 N. Y. 353, 364.)
Before submitting to any interrogation, the defendant B immediately made known to the detective that he desired the aid of counsel. In apparent compliance with the procedures mandated by Miranda v. Arizona, the detective decided to abandon any attempt at that time to continue with any interrogation of B.
If he were truly impelled to give this young man an opportunity to obtain the aid of counsel, he would have forthwith left the B residence. Instead, he embarked upon a course of conduct calculated to use this young man’s father as his dupe to induce a confession and to circumvent the boy’s right to the aid of counsel.
When he stopped his interrogation of B he did not leave alone, but left with B’s father to visit the pro shop. By undertaking to accompany Mr. B on his visit to the pro to discuss restitution and the withholding of prosecution, he was casting himself in the role of one leading the defendant and his father to believe that an adjustment would be made and that the aid of counsel was not necessary, which is wholly incompatible with the conduct mandated by Miranda when an accused refuses to be interrogated and demands aid of counsel.
The making of restitution is a commendable concept in the administration of criminal justice. However, it is to be made subject to and under judicial control and not as part of a bargain to avoid prosecution. (Penal Law, § 570.)
Here, there was held out to the father and son the false hope that no complaint would be made if any alleged stolen property was returned to the owner. The personal involvement of the detective, by assisting and encouraging in such pursuit by the father, could only have created in the minds of the father and the son an apparent facade of a lawful endeavor, particularly so since it was done in the very presence and with the knowledge and apparent approval and co-operation of an agent of the law.
The intended and actual effect of this conversation between the detective and Mr. B in the son’s presence, and their visit to the pro shop, upon which the detective traded, was to hold out such inducement to the father as to, by virtue of his parental position, impel him to encourage and advise his son to surrender, all at one time, his privilege against self incrimination under the Fifth Amendment and his right to the aid of counsel under the Sixth Amendment.
*796 Miranda v. Arizona (supra) as well as the following cases cast the parent in the role of the youth’s protector: Gallegos v. Colorado (370 U. S. 49 [1962]); Haley v. Ohio (332 U. S. 596 [1948]) and Matter of Dennis (20 A D 2d 86).
In this case, the detective, by his methods, converted the father into his ally and the son’s adversary. He was thereby able to so control the mind of the father by such false hope and inducements as to persuade the latter, as the adviser and confidant of his son, to counsel him to relinquish his constitutional rights, against his interest.
Similarly, by relating the above-mentioned conversation between the detective and his father, together with their ensuing visit to the club pro, there was created in the mind of this young man the belief that any waiver by him would be meaningless (so far as his rights were concerned) since the necessity for him to assert any rights no longer existed because no criminal proceedings were to be brought against him.
As stated in Fay v. Noia (372 U. S. 391, 439): “ The classic definition of waiver enunciated in Johnson v. Zerbst, 304 U. S. 458, 464 — ‘an intentional relinquishment or abandonment of a known right or privilege ’ furnishes the controlling standard.”
The contrived atmosphere of calm created by the conversation and activities of the detective and B’s father created in this young man’s mind an attitude of casual indifference toward the vital legal choices to be made.
While so induced into such false sense of complacency this defendant could not, and did not, make a voluntary and intelligent waiver of his constitutional rights to the aid of counsel, and against self incrimination. The methods which were employed to effect this end were repugnant to our established concept of due process.
The abhorrence of society to the use of such involuntary confession is not based alone on its inherent untrustworthiness but primarily on the methods used to extract it, which offend an underlying principle in the enforcement of our criminal law and which also violate our procedural standards of due process. (Rogers v. Richmond, 365 U. S. 534, 540-541; Spano v. New York, 360 U. S. 315, 320-321; Blackburn v. Alabama, 361 U. S. 199; Watts v. Indiana, 338 U. S. 49, 54.)
The court can, indeed, conceive of very little difference between ‘ ‘ The misleading answer given by the Chief of Detectives that there was nothing wrong and no need for a lawyer threw defense counsel off guard ” of People v. Ressler (17 N Y 2d 174,178) and the false inducements encouraged by the detective in this case which likewise threw this defendant and his father off guard. *797 Certainly, if a trained, defense counsel can be so disarmed, an inexperienced young man can be expected to fare no better against such methods.
This doctrine has been established and followed in this State by People v. Leyra (302 N. Y. 353, 364) where Judge Froessel, speaking for the Court of Appeals, said: “ We have held that an involuntary confession is by its very nature evidence of nothing (People v. Valletutti, [297 N. Y. 226], 231). Moreover, our Federal Constitution (14th Amendt.) is a bar to the conviction of any individual in our courts of justice by means of a coerced confession (Ashcraft v. Tennessee, [322 U. S. 143]). We have a like provision in section 6 of article I of our State Constitution. A denial of due process has been defined as the failure to ‘ observe that fundamental fairness essential to the very concept of justice. * * * Such unfairness exists when a coerced confession is used as a means of obtaining a verdict of guilt. ’ (Lisenba v. California, 314 U. S. 219, 236-237.) Not only is the use of a coerced confession in obtaining a conviction a violation of due process, but, if such confession is admitted in evidence, that is sufficient to void the conviction regardless of other evidence which might nevertheless demonstrate guilt (Malinski v. New York, 324 U. S. 401, see, Note, 93 L. Ed. 115; Watts v. Indiana, 338 U. S. 49; Turner v. Pennsylvania, 338 U. S. 62; Harris v. South Carolina, 338 U. S. 68; Haley v. Ohio, 332 U. S. 596; Ashcraft v. Tennessee, supra; Chambers v. Florida, 309 U. S. 227).”
This concept has been carried forward to the present and amplified by Miranda v. Arizona which holds (384 U. S. 436, 476, supra): “ Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege ”.
As to the spontaneity or delay of a statement given after the Miranda warning, that case holds on page 475: “An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained”. (Emphasis added.)
The events taking place between July 12 and July 14 and their effect upon the defendant’s capacity to make an intelligent choice militate against the conclusion that an intelligent and voluntary waiver of counsel took place. The burden cast upon the prosecution to show the contrary has not been sustained.
*798 The People urge the cases of People v. Rodney P. (Anonymous) (21 NY 2d 1); People v. Torres (21 N Y 2d 49) and People v. Baker (28 A D 2d 24) in support of their position. The court finds that these authorities have no application to the case at bar because they all involve spontaneous voluntary confessions by the defendants freely given and without the use of the prejudicial and unfair methods used to extract the statement from the accused as was done here. Much is made of the argument that Miranda v. Arizona applies only to in-custody interrogation. This may be quite correct; however, even in a noncustodial situation the accused is not rendered fair game for any prejudicial or coercive treatment to force a confession. His privilege against self incrimination, right to counsel and all other constitutional rights are perpetual and exist at all times. He is, under such circumstances, and at such time, not a special target for the practices utilized in this case.
Unfair, coercive and overreaching methods resulting in a confession at anytime and anywhere are to be struck down with equal vigor as violative of the due process clause of the Constitution.
Turning now to the rights of the defendant, S, the court finds that the alleged inculpatory statement attributable to him by the detective must be suppressed for the following reasons.
The People have failed to prove beyond a reasonable doubt that the defendant, B, consciously and intelligently waived his right against self incrimination and the right to the aid of counsel, and that his alleged confession was given voluntarily.
At the time when the defendant, S, made the alleged confession to which the detective testified at this hearing, he was indeed in custody. This conclusion is reached by the court from the following facts. (1) The detectives came to his place of business during the hours of work; (2) they waited there for him; (3) they identified themselves as police officers to the persons in the place of business; (4) they interrogated him in the presence of the public relations officer of the firm; (5) in spite of his request for counsel, they persisted with their inquiry and told him that B implicated him; (6) instead of stopping their interrogation when he demanded counsel, they remained; (7) instead of leaving him to obtain counsel or consult with others as he requested, they waited for him to “ punch out ” and took him to B’s house in the rear of a police car; (8) they persisted in the inquiry by confronting him with B; (9) that at the time S was 18 years old; (10) that they did not notify his parents after he requested counsel or to speak to someone else.
*799 From the foregoing it comes as an irresistible conclusion that this young man was in custody at all times and that he was never given a chance to confer with counsel and that his waiver, if it so be characterized, was not “ knowingly and intelligently ” made.
In this connection, Miranda v. Arizona (384 U. S. 436, 475, supra) holds: “If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained and appointed counsel.”
The People have failed to sustain this burden.
The failure to arrest at his place of employment is, at most, a mere contrivance to make it appear that he was not in custody. Having already been implicated by B, probable cause for his arrest existed when the police officer encountered him in the office of his employer.
There is a presumption that a police officer, as well as other public officials, will perform his duty (Kane v. Walsh, 295 N. Y. 198, 206), and where probable cause exists, he will make an arrest. Under the circumstances, the detective’s contention that S was not in custody is not to be believed.
Apart from the foregoing, the motion to suppress on behalf of the defendant S must be granted for the following additional reasons: The court having herein determined to suppress any alleged inculpatory statement attributed to the defendant B upon the ground that the same was obtained in violation of the Fourteenth Amendment of the Constitution of the United States, anything therein contained is deemed part of the poisoned tree. (Silverthorne Lbr. Co. v. United States, 251 U. S. 385, 392; Nardone v. United States, 308 U. S. 338.)
B’s alleged implication of S is part of the poisoned tree, insofar as it led to S’s alleged confession, the latter must be barred as fruit of the poisoned tree. (Wong Sun v. United States, 371 U. S. 471; Fahy v. Connecticut, 375 U. S. 85; United States v. Gorman, 355 F. 2d 151; People v. Rodriguez, 11 N Y 2d 279; People v. Ressler, 17 N Y 2d 174, 179.)
The witness Tittrington testified that at an encounter with S after April 20, 1967, he said to him, “ I heard that you went ahead and did what you were supposed to do the other night ”, and he characterized the latter’s answer as follows: “ Well, he said that they did what they said they was going to do ”. The court finds that this statement was not involuntary and is therefore not suppressed.