**Arthur J. FREIJE, Defendant, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Russell P. SAIA, Defendant, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Alfred SARNO, Defendant, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Nos. 7156–7158.**

United States Court of Appeals First Circuit.

March 20, 1969.

Clifford J. Ross, Manchester, N. H., by appointment of the Court, with whom Charles Solms, III, and Eaton, Eaton,

Ross & Moody, Manchester, N. H., were on brief, for appellant Arthur J. Freije.

Alexander J. Kalinski, Manchester, N. H., by appointment of the Court, for appellant Russell P. Saia.

Martin L. Gross, Concord, N. H., by appointment of the Court, for appellant Alfred Sarno.

William H. Barry, Jr., Asst. U. S. Atty., with whom Louis M. Janelle, U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

In 1966 the grand jury returned a twelve count indictment charging the defendants with violation of 18 U.S.C. § 2312 (the Dyer Act) and 18 U.S.C. § 371 (conspiracy). The first six counts charge Saia alone with interstate transportation of stolen automobiles. Counts VII, X and XI charge Freije alone with this offense; Count VIII charges Sarno and Count IX names both Saia and Freije. Each of these counts applies to a different automobile. Count XII charges a conspiracy on the part of all three defendants.

When the case first came to trial Saia pleaded guilty to the first six counts and the other counts against him were dismissed. In addition Count XI (against Freije) was dropped. Conviction of Freije (on three substantive counts and conspiracy) and Sarno (on one substantive count and conspiracy) resulted but we reversed and remanded for a new trial. See Freije v. United States, 386 F.2d 408 (1st Cir. 1967). Shortly before the second trial Saia was allowed to change his plea to not guilty as to the first six counts and was accordingly tried with Freije and Sarno. For reasons of double jeopardy, however, Counts IX and XII were not reinstated as to Saia. At the second trial the district court, sitting without a jury, found Saia guilty on Count II and found Freije and Sarno guilty on the conspiracy count only.

The record of the second trial reveals that the defendants were connected with

an auto sales business in South Boston known variously as King Motors or Prudential Motors. Saia and Sarno worked in Boston whereas Freije served as a finder of potential customers in the Manchester, New Hampshire area. Although the business was duly licensed, there were certain irregularities in connection with its acquisition of automobiles. In the usual case the automobile was purchased on a loan basis and was then resold. The main issues presented are whether there was any intent to keep up the payments on these loans, since otherwise the vehicles would be "stolen" within the meaning of the Dyer Act,[1] see United States v. Turley, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957); also, whether the automobiles were transported with knowledge of any such felonious arrangement.

Defendant Freije appeals on one issue only. After certain of the cars were repossessed by the original dealers, agent Madden of the FBI called Freije from the Manchester Police Station and suggested an interview. Freije went to the police station and now complains because he was not warned of his rights as required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[2] Agent Madden testified that he merely requested an interview with Freije and that he had not specified the police station but "told him I would meet him any place or talk to him any place he so desired." Whereupon, according to agent Madden, "[h]e suggested I stay there and he would come over to the Manchester Police Department, which he did." Freije, on the other hand, testified[3] that Madden had ordered him down to the police station and that he felt that he was not free to leave. After hearing this, the district court permitted agent Madden to testify

concerning the interview, ruling that Freije "submitted to the interview without any compulsion or sense of obligation that would impose the requirements that the Supreme Court indicated in the Miranda decision."

■ The question then is whether the district court misinterpreted the Supreme Court's definition of custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra, at 444, 86 S.Ct. at 1612. We think it did not. The record is reasonably susceptible of the interpretation that Freije was in no way compelled to come to the police station, much less to answer questions. Indeed, when he saw fit Freije declined to answer any more questions and there is no suggestion that anyone challenged his right to do this.

At oral argument counsel for Freije placed great stress on what he regarded (with acquiescence of government counsel) as a mistake in the record as to a portion of Freije's testimony. In the statement, "I figured until I got out and saw somebody, that I wasn't going to *stay* any more" (emphasis supplied) counsel suggested that "stay" was interpolated for "say." Moreover, Freije himself seemed to distinguish sharply between his right not to answer questions (which he obviously recognized) and his right to terminate the interview by leaving (which he claims he did not). The argument then, we suppose, is that since he believed he was not free to leave, he was in custody for purposes of *Miranda* and should have been warned of his unqualified right to counsel.

The district court, which was free to disbelieve entirely the self serving testi-

---

1. A few of the vehicles were stolen in the more conventional sense of the term.

2. Actually, Freije was warned that he had a right to remain silent, that anything he said could be used against him and that he had a right to counsel. He was not told, however, that counsel would

be appointed if he could not afford counsel of this own. See *Miranda, supra* at 467–473, 86 S.Ct. 1602.

3. Freije did not testify for all purposes but was questioned on voir dire to determine whether agent Madden should be allowed to testify concerning the interview.

mony of Freije, found that this was not a custodial interrogation. See Hicks v. United States, 127 U.S.App.D.C. 209; 382 F.2d 158, 162 (1967): "Questioning of a witness cannot be characterized as 'custodial interrogation' simply because it occurs at a police establishment, * * since she never attempted to leave the presence of the police, it cannot be said that her presence at Headquarters was against her will * * *." Compare with the instant case, United States v. Harrison, 265 F.Supp. 660 (S.D.N.Y. 1967) where the district court was not favorably impressed with the government's claim that the defendant came to the police station voluntarily. There the police came to the defendant's home and "suggested" that he accompany them to the police station. Thus two distinguishing factors are present: (1) The police officers physically came to get him. (2) It is undisputed that the defendant was given no alternative to the police station as the situs of the interrogation. Also see United States v. Knight, 261 F.Supp. 843 (E.D.Pa.1966). In that case an air force investigator telephoned a former airman and, after telling him that they were investigating certain matters that had occurred at a base during the airman's tenure there, sought to arrange an appointment. The airman agreed to come to the investigator's office and the resulting interrogation was held to be non-custodial.

Finally, the criterion for determining whether an interrogation comes within the *Miranda* rule is not purely subjective. Thus, even if it be assumed that Freije really believed that he was not free to leave the interrogation,[4] it would not inevitably follow that the warnings should have been given. See People v. P., 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967); cf. Hicks v. United States, *supra,* at 161.[5]

We turn now to defendant Saia's contentions. Theodore Solomon, a contact of Freije's in Manchester, purchased a 1965 Chevrolet Impala convertible (the Count I vehicle) through Freije in the fall of 1965. Shortly thereafter the automobile developed serious mechanical problems. Freije and Sarno then promised Solomon to get him another car, a 1966 Chevrolet Impala convertible, conditioned, however, on the payment of an additional five hundred dollars. It was in connection with this second car, the Count II car, that Saia was convicted.

On November 17, 1965, one Francis Ryan purchased this vehicle from Seymour Chevrolet in Cambridge, Massachusetts for an agreed price of $3,195. The financing was arranged through GMAC. Ryan picked up the car around 5 p. m. the same day. Later the same evening Solomon received his new car at a parking lot near a club in Manchester where he was employed. According to Solomon, Saia came to the club and told Freije that the car had arrived. After receiving his car, Solomon gave Saia a ride back to Cambridge, Saia being without transportation. Freije remained in the club. This was repossessed from Solomon on February 25, 1966, in Manchester because GMAC did not receive any payments.

4. Apart from whether the asserted error in the record exists, we note that the district court made its ruling on this question immediately in open court and therefore was not affected by any subsequent mistake in transcribing the testimony.

5. In his brief, defendant Freije emphasizes Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968). In that case the defendant concededly was in custody. There the government contended: (1) that the questions were asked in connection with a routine tax investigation where perhaps no criminal charges might result; (2) that the defendant was in jail in connection with another offense.

That case is not pertinent here because the very issue is whether defendant was "in custody" at the time of interrogation. Compare Clark v. United States, 400 F.2d 83 (9th Cir. 1968) where defendant was questioned at police headquarters concerning an accident involving an automobile that turned out to be stolen. Defendant's statements were admitted at the subsequent Dyer Act trial despite the absence of *Miranda* warnings on the grounds that the defendant had not been in custody.

The financial arrangements on the Count I vehicle were as follows. It was purchased by Paul J. Sullivan for $3,050 at West End Chevrolet, Waltham, Massachusetts, on or about October 11, 1965, and the credit information was called in to West End by Saia. There was a $550 down payment plus a conditional sales contract for $2,500 with the bank that financed the sale. A perfunctory check on Sullivan conducted by the bank revealed that such a person seemed to exist, was employed, etc. Shortly thereafter Solomon purchased this same car through Freije for $3,050 and paid for it outright, having arranged his own financing.

The second sale on this car was discovered not because of default in payments, although no payments were made, but because the garageman making the repairs under the warranty listed Solomon as the owner. Since this did not square with the dealer's records, the dealer reclaimed the car and it was back in his inventory less than a month after the Sullivan purchase. After the repossession West End regarded Saia as Sullivan's agent.

Saia arranged a total of five sales with West End. When West End demanded payment in full for all of them, Saia "promised to clarify all five accounts." The other three cars are not the subjects of indictment counts.

Saia poses four questions:

1. Whether the Count II vehicle was stolen for purposes of the Dyer Act?

2. If so, whether Saia knew that it was stolen?

3. Whether there was evidence from which the trier of fact could infer that Saia transported the vehicle in interstate commerce?

4. Whether Saia's motion for severance should have been granted?

■ The first two questions may be treated together. We agree with the government that although Saia was convicted on only one count, we may examine all the evidence properly admissible against Saia insofar as it sheds light on Saia's knowledge and intent relative to the Count II automobile.[6]

The financial arrangements in regard to the Counts III to VI vehicles were as follows:

*Count III vehicle:* This was purchased by one John Contardo from West End Chevrolet for an agreed price of $3,150. Shortly thereafter a John Ganem of Manchester purchased the car through Freije for a $2,500 check. The car was later repossessed for default in payments in connection with the Contardo purchase. The credit information on Contardo was phoned in to West End Chevrolet by Saia in an arrangement similar to Count I.

*Count IV vehicle:* This vehicle, a Cadillac convertible, was purchased by Joseph DeLuca (who turned out to be Saia) on September 29, 1965, from the Cadillac Company of Boston. The agreed price was $5,300. Cadillac repossessed this car because it discovered that the transaction was fictitious, not because of default in payments.[7]

On or about September 30, 1965, one John Balon of Manchester purchased this car through Freije for $4,300. Mysteriously, the bill of sale Balon received was from Walker Pontiac, Inc. and specified a sale price of $5,300, despite the fact that Balon thought that he was doing business with King Motors—Prudential Motors, and in fact paid only $4,300.[8]

---

6. It may be noted in this connection that although the district court found Saia guilty on only one of six counts, the reasonable doubt on the other counts was restricted to the element of transportation, not to the questions of knowledge and intent.

7. Actually, after the irregularity was revealed Cadillac received a registered check for $306.72 which it held in escrow pending repossession.

8. A police officer investigating this matter received a telephone call from Saia who

*Count V vehicle:* The Count V vehicle has much in common with Count IV and was ultimately purchased by a Stanley Gibert, Balon's stepfather. Here, too, in late September of 1965, Saia purchased a 1965 Cadillac from Boston Cadillac for an agreed price of $5,300 and sold it almost immediately in Manchester for $4,300. In this instance, however, Saia purchased the car under the name of Peter J. Russell and sold it to Gibert, once again with a Walker Pontiac invoice. Gibert testified that in a meeting at the Cadillac company Saia identified himself as the purchaser of the car.[9]

Saia arranged these two purchases with Charles Pernokas, a salesman at Cadillac, whom he had known some years before when they were both employed at another automobile agency. Saia called in orders under fictitious names and Pernokas took the information and later delivered the cars to Saia's place of business.[10] Pernokas testified that he offered to share his commissions with Saia for supplying the customers but Saia refused. Had all of this been true, we would have the spectacle of Saia, an operator of a financially precarious automobile agency, drumming up business for Boston Cadillac-Olds and insisting on supplying his services gratuitously.

█ While all of the above [11] resists neat summary, we think that the overall picture clearly suggests that the Count II automobile was stolen in the sense that it was purchased without intent to meet the payments and that Saia was well aware of this. The mathematics of the situation indicates that the operation was not financially viable.[12] Admittedly this could not be said if only Counts I and II were considered since the Count I vehicle was sold for the same price at which it was bought, whereas the Count II vehicle was bought for an additional $145 and realized an additional $500. This is not, however, a reason to suppose that Saia would have been especially zealous in keeping up payments on the Count II car, as indeed he was not.

█ The next question is whether there is evidence from which the court could infer beyond a reasonable doubt that Saia transported the Count II vehicle to New Hampshire. We think there is. The fact that Saia came to announce the presence of the car to Solomon and then was in need of a ride back to Boston is in itself strongly persuasive that he had brought the car. In addition is the testimony of Solomon that it was understood that Saia would bring the car.[13]

█ The final question as to Saia concerns the right to a separate trial. This defendant, quoting our opinion in Sagansky v. United States, 358 F.2d 195, 199–200 (1st Cir.), cert. denied, 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966), apparently recognizes that he faces a substantial legal obstacle:

"As we said in Gorin v. United States, *supra* [313 F.2d 641], to obtain severance defendants must make a strong showing of prejudice in order to invoke the discretionary remedies provided in this rule. It is well settled that the granting of severance lies in the discretion of the trial judge. * * * *"

admitted that he had purchased the car under the name of Joseph DeLuca. Saia explained that he went about things in the way he did because "he had to come up with some money that he owed the boys, and he didn't want to end up as victim No. 33."

9. A payment of $304.12 received on this vehicle was also held in escrow pending clarification of the transaction.

10. The retail sales agreements which were signed by "Russell" and "DeLuca" were or should have been signed in the presence of Pernokas.

11. We find it unnecessary to discuss Count VI.

12. Quite apart from consideration of what funds might have been put to one side to pay "the boys."

13. A. "Spud [Freije] told me—Spud says Saia was bringing this car up yesterday."
Q. "That Mr. Saia was coming up with the car, Freije told you this?"
A. "Yes."

We may add now that this is especially so in a jury-waived trial. See Edwards v. United States, 206 F.2d 855 (10th Cir. 1953); Long v. United States, 160 F.2d 706 (10th Cir. 1947).

■ Saia specifically claims, however, that he was prejudiced by the fact that the court considered testimony that was hearsay as to him.[14] The court acknowledged that this testimony was hearsay and said that it would be disregarded as to Saia. Defendant now contends that the court must not have disregarded it, since its finding that Saia transported the Count II vehicle is otherwise inexplicable. There are two answers to this contention. (1) As indicated above, there is sufficient evidence that Saia transported the vehicle apart from the testimony in question. (2) The contention proves too much. As the government points out, had the court relied on the hearsay statements Saia would have been convicted on several more counts. United States v. Catino, 403 F.2d 491 (2nd Cir. 1968).

■ Sarno contends that whatever might have been shown about his involvement, the government has not succeeded in proving guilty knowledge. The government, pointing out that such mental elements are rarely susceptible of direct proof, calls attention chiefly to the following circumstances as support for the conviction of Sarno on the conspiracy count. (1) When Solomon's car broke down, Sarno promised to supply a new one. Freije called Sarno in Boston but the record is contradictory as to whether Solomon himself talked to Sarno.

(2) Sarno delivered the Count III vehicle to Ganem in Manchester. (3) Pernokas testified that Sarno accompanied Saia when the latter was examining the Cadillac convertibles and was at the lot in South Boston when one of them was delivered. (4) When Balon's car (Count IV) was repossessed, Freije told Balon to call Sarno in Boston to straighten it out. Sarno also assumed a role in attempting to straighten out the problem with Gibert (Count V). (5) In regard to the Count VIII automobile,[15] Sarno (a) delivered the vehicle in Manchester; (b) negotiated the sale at the club; (c) gave a bill of sale to the purchaser Samara and later gave him a corrected bill of sale.

While there is a certain persuasiveness to Sarno's contention that these factors go merely to the question of participation in fact rather than the question of knowledge, we think that this is only superficially so. Considering these facts in the light of the entire record, we think the district court's finding that Sarno knew "what was going on" was a reasonable conclusion. It is not merely a question of Sarno's status with the business. It is a question of his knowledge. In a business so small in terms of personnel it is not easy to believe that Sarno could have been involved as intimately as he was without having been aware of the financial arrangements involved in the buying and selling of the cars. See Mayzak v. United States, 402 F.2d 152 (5th Cir. 1968). After all, the court was entitled to use common sense.

Affirmed.

14. This related to statements made by Freije in a second interview with an FBI agent.

15. At the close of the government's case, the court granted a motion for judgment of acquittal in regard to Count VIII on the grounds that the proof of knowledge was insufficient.