Thomas Bussell Jones, J.
This court conducted a Morales-type (396 U. S. 102) or Huntley-type (15 N Y 2d 72) hearing beginning February 17, 1970, for a period of about 10 days to determine whether the confessions of both these defendants were the inadmissible fruit of an illegal detention, and whether with respect to both of the defendants their confessions were voluntarily made to the police.
Alex Chefetz was bound, gagged and died in his apartment at 275 Kosciusko ¡Street, in Brooklyn, on May 5, 1969. He had *635 apparently been robbed. The police began their investigation, and on May 22, 1969 two detectives went to the apartment of Mrs. Bernice Banks at 272 Tompkins Avenue and gained admission. They asked Mrs. Banks for the defendant Donald Pounds under the name of ‘‘ Smokey ’ ’, and for the defendant, Charles Shuman under the name of “ Charles Although Shuman was present in the apartment at the time, he did not respond to the name of “Charles” or “Charlie”, by which he was known.
The defendant Pounds was asleep in the bedroom and emerged when called into the room where the police were. Then the police entered Pounds’ bedroom, watched him dress, and took him to the main squad room of the precinct for interrogation.
From the time the police entered Pounds’ bedroom until he confessed his part in the robbery of Alex Chefetz, Pounds was in their custody and under their control.
The defendant Shuman went to the precinct station voluntarily after telling his hostess, Mrs. Bernice Banks, something to the effect that “I can’t be running all my life. I’m too young for that.” When Shuman arrived at the precinct station, he also confessed his role in the robbery of Alex Chefetz, after being warned in accordance with Miranda (supra). There was some testimony about Mrs. Banks’ effort to talk with Shuman at the precinct station without success, and the defendant’s attorney argues that Shuman had been held incognito by the police. A brief comment will be made concerning these events in short order. I find, however, that Shuman was given the Miranda warnings, understood them, and voluntarily confessed the crimes. I find, however, that the police obtained the preliminary incriminating information about Shuman from the tainted source which was their illegal custodial interrogation of Pounds, and that their interrogation of Shuman was guided and confirmed by the statements which they had. elicited from the defendant Pounds.
These criminal proceedings began with what this court characterizes as a lawless seizure of the person of the defendant Pounds from his bed in the house of his friend, Mrs. Banks, on May 22, 1969. The police detectives were then investigating the murder of an old man in the neighborhood. They did not know nor had they any cause to believe that Pounds was implicated in the slaying when they confronted him in the apartment of his benefactor. The record supports the finding in this regard. On more than one occasion the police said they did not *636 know that Pounds or Shuman were involved in the slaying of the unfortunate victim, Chefetz, when they confronted them in the Banks’ apartment.
At the time of his detention Pounds was 18 years of age, of dull normal intellect, with only a third-grade reading ability. This intellectually limited youth was ordered by the police officers to get dressed and accompany them to the precinct station. They watched him dress, and then removed him in close confinement to their headquarters, where he confessed his involvement in the crime, an hour or two later.
The testimony of Pounds’ school grade adviser, Mrs. Kimper, and of the psychiatrist, Dr. Grlozek, reveals that Pounds was below average intelligence. While Dr. Grlozek believed that he was able to comprehend most of the words which were said to him in respect of the so-called Miranda (supra) warnings, some of them, she indicated, he could not have understood. This court'finds that the police had no right or authority to remove Pounds from his bed and home and to keep him in close custody and to question him as they did, lacking probable cause to believe that he had committed a crime.
It would be idle fantasy to assume that such an ignorant youth, a product of a lowly environment, could understand, even when told, that he possessed the privilege against self incrimi-. nation. As Mr. Justice Douglas observed in his concurring opinion in Culombe v. Connecticut (367 U. S. 568, 641) “ The system of police interrogation under secret detention falls heaviest on the weak and the illiterate — the least articulate segments of our society.” The Supreme Court of the United States in Morales v. New York (396 U. S. 102) rejected the view that the Fourth Amendment to the Constitution permits custodial interrogation or arrest on less than probable cause, as was suggested by Mr. Justice Sobbl in People v. Estrialgo (37 Misc 2d 264, 274) and returned that case to the New York trial court to adduce evidence on probable cause. Even though the defendant belatedly raised the Fourth Amendment argument for the first time at the level of the Court of Appeals in Brinegar v. United States (338 U. S. 160, 175-176) the court declared, ‘ ‘ 1 The substance ’ * * * of probable cause 1 is a reasonable ground for belief of guilt ’. * * * This ‘ means less than evidence which would justify condemnation ’ or conviction, as Marshall, C. J., said for the Court more than a century ago in Locke v. United States, 7 Cranch 339, 348. Since Marshall’s time * * * it has come to mean more than a bare suspicion: Probable cause exists where ‘ the, facts and circumstances within- their [the officers’] knowledge and of *637 which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that-’ an offense has been or is being committed. Carroll v. United States, 267 U. S. 132, 162.
“ These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community’s protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers’ whim or caprice.”
What circumstances justify detention for questioning? “ Detention for questioning has its manifest evils and dangers,” said the court in People v. Morales (22 N Y 2d 55, 64-65). “ A suspect may be 'detained upon reasonable suspicion for a reasonable and brief period of time for questioning under carefully controlled conditions protecting his Fifth and Sixth Amendment rights. * * * The scope of the authority to question is limited to those persons reasonably suspected of possessing knowledge of the crime under investigation in circumstances involving crimes presenting a high degree of public concern affecting the public safety.” (Emphasis supplied.)
When is detention allowed for questioning? In Miranda v. Arizona (384 U. S. 436, 477) the court said: “ General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding.” In other words, the police are expected to seek witnesses and ask questions, and that pertains basically to on-the-scene interrogation. The scene changes, of course, when they take a person into custody. A person is in custody when 1 ‘ the situation ’ ’ confronting him [that is, the person taken into custody] 6 ‘ is instinct with coercion, ’ ’ said the court in Bumper v. North Carolina (391 U. S. 543, 550). To satisfy the Federal and State constitutional requirements, to meet the standards of the Fourth Amendment, the seizure of the person can only be, on probable cause. Just as search warrants issued in the absence of probable cause have been voided and the article seized suppressed, so should the unwarranted *638 seizure of a human being be disallowed, and any statements made or information elicited from him thereafter must be suppressed, in order that we may comply with the United States Constitution and maintain a decent respect for the law. Before the police may take a person into custody or arrest him, it must be shown that a crime has been committed and they have reasonable cause to believe that the person under their control committed it. The police have the authority to stop a person and demand an explanation of his actions, if they reasonably suspect he was committing, had committed or was about to commit a felony. This is in accordance with section 180 of the Code of Criminal Procedure. But, they-may not take him into their control even then, unless the detained person’s responses or behavior confirms their reasonable suspicions.
In this case, the police officers acknowledge that they had no information and no reasonable grounds to believe that Pounds had committed any crime. They acted only on an inchoate and unparticularized suspicion or hunch as far As this record shows. They would have had no right to stop Pounds on the street under these circumstances, far less confront him in his bedroom and remove him to the precinct station, even with his alleged consent.
In People v. Albright (32 A D 2d 878) the Appellate Division, Fourth Department, said in an unanimous opinion, ‘ ‘ Inasmuch as the officers had no initial right to stop defendant and interrogate him the ensuing search (although made with appellant’s consent) was fatally infected and the fruits thereof should be suppressed.”
"Whenever a police officer exercises dominion and control over a person, that person is in custody despite any denials by the officer. One is in custody when he has been ‘ ‘ deprived of his freedom of action in any significant way.” So says Miranda (supra, p. 444).
In this case, the unlawful detention began when the officer entered Pounds ’ bedroom and continued through to the precinct station and the time when he confessed.
Brief detention outdoors which may be done without probable cause does not include taking the detainee into actual custody in a police car or to a police station for that purpose. (See People v. Lane, 10 N Y 2d 347.)
To emphasize that the Fourth Amendment requires supervision by the court of the detainee’s rights at every stage, the Supreme Court in Terry v. Ohio (392 U. S. 1, 19) said and the Terry decision guides this court with respect to the present case: “ We # * * reject the notions that the Fourth *639 Amendment does not come into play at all as a limitation upon police condu'ct if the officers stop short of something called a ‘ technical arrest ’ or a 1 full-hlown search.’ ” In People v. Yukl, a recent case, (25 N Y 2d 585, 589) the court said, “ The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s position. (Hicks v. United States, 382 F. 2d 158 * * *.) Moreover, the fact that a defendant is being interviewed in the police station does not necessarily mean that he is to be considered ‘ in custody ’. * * * This is merely one of the factors to be considered in reaching the ultimate conclusion.” When speaking of the defendant Pounds, this court takes into account the standards set forth in Culombe v. Connecticut (367 U. S. 568, 601) where reference is made to the physical and mental state of the defendant; the diverse pressures which sap or sustain his powers of resistance. That case also speaks of psychological factors. It also talks about the eternal psychic state of the individual. It deals at great length with the question of the individual’s ignorance or lack of ignorance, his mental capacity to understand. The case of Haley v. Ohio (332 U. S. 596, 599) involved a 15-year-old boy who was arrested at his home and taken to a police station at midnight where he was questioned by relays of officers until he confessed at 5:00 a.m. He had seen no friends or counsel during that time and was held incommunicado for three days. The court looked at the totality of the circumstances and held that the confession had been coerced.
Pounds’ mental deficiencies rendered him suggestible and subject to intimidation. He “broke”, as it is said, almost at once, upon being removed to the police station, and answered “Yes”, simply “yes”, to every question, even those which contained sophisticated polysyllabic words like “ alleged.”
This court is persuaded that we must consider the accused’s mental condition at the time he was interrogated in determining whether there has been an effective waiver of his constitutional rights. The cases of People v. Drake (15 N Y 2d 626) and People v. Davis (23 A D 2d 963) concern voluntariness as it is applied to mental defectives. In People v. Drake, the Appellate Division, Third Department, found that a defendant with an I. Q. of 83 (which is a dull normal range), could not competently and intelligently waive his right to counsel, and vacated a conviction for burglary in the third degree. In Fikes v. Alabama (352 U. S. 191) United States Supreme Court reversed a sentence of death upon conviction of burglary with intent to commit rape because the defendant was found to *640 be uneducated, of low mentality, and when interrogated responded by “yes-no” answers to leading questions. The weaker the mind, the shorter the time required to compel compliance with the suggestions made by a stronger will.
Pounds was said to be a nonreader; cannot read subway signs; in a tenth grade class reading at a third grade level. His grade adviser, Mrs-. Kimper, said that Pounds could not comprehend simple words read or spoken to him or abstract phrases such as “ Anything you say may be used against you in a court of law.” She said four out of the five of the Miranda questions would be incomprehensible to him. You will find also that Mrs. Kimper said that Pounds did not respond to English until words were broken down. She said she had to rephrase or simplify to make Pounds understand. Pounds could not grasp the meaning of the word ‘ ‘ impossible ’ ’, she said. Pounds was classified as dull normal, she said, and as of below average intelligence. “ Pounds cannot read,” said Dr. Grlozek. “Pounds’ intelligence is on a border line level,” said Dr. Grlozek. “ He has difficulty in figuring out even simple words. His general knowledge is poor,” and finally, “ Pounds may not have fully comprehended the Miranda warnings,” said Dr. Grlozek. The record is replete with references to the incapacity of Pounds to comprehend.
What was said to him in the precinct station by way of Miranda warnings 1 The admissibility of a minor’s confession also depends on his age, his intelligence, his experience, as well as his ability to comprehend the meaning of questions asked and the effect of his responses. The effect of his responses, I repeat. For that purpose, see People v. Steven J. B. (23 N Y 2d 611) in which the case of People v. Lara is cited and that is found at 67 Cal. 2d 365, certiorari denied in 392 U. S. 945. The test applied in Gallegos v. Colorado (370 U. S. 49) to youthful defendants is of interest. The guide to decision in the cases affecting minors is the ‘ ‘ totality of circumstances.” A youth like Pounds, of dull normal intellect, who read only at third-grade level at the age of 17 years, and whose intellectual capacity was shown not to have improved over time, compared with an adult in full possession of his senses and knowledgeable of the , consequences of these admissions, cannot be said to meet the tests required by the Constitution. -
In Sims v. Georgia (389 U. S. 404, 407) the Supreme Court speaks about the problems which are presented when law enforcement officers are dealing with an illiterate. “ The fact *641 that the police may have warned petitioner, [an illiterate] of his right not to speak is of little significance.”
In Davis v. Mississippi (394 U. S. 721, 726) Judge Brennan of the Supreme Court, brushed aside the idea that the Fourth Amendment does not apply to the investigatory stage of police investigation or interrogation. He said investigatory seizures would subject unlimited numbers of innocent persons to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizens whether these intrusions be classified as arrests or even investigatory intrusions. This is the thrust of this court’s opinion.
The court calls attention to the well-known case of Clewis v. Texas (386 U. S. 707), in which the Supreme Court of the United States enumerates factors for determining when a confession was involuntarily made. The comment in a footnote to page 711 is worthy of note in this connection. “ The arresting officer testified that he merely asked petitioner to accompany him to the police station. He was of the opinion that he had no probable cause to arrest the petitioner. Plainly, however, petitioner must be considered to have been taken into custody either at the time the officer came to get him, or shortly thereafter when the police, by their conduct, effectively asserted a right to detain him indefinitely at the jail.” If, under the circumstances of this case, excluding any consideration of Pounds’ low intellectual level as a factor, if he made a confession without first having been advised of the Miranda warnings, there is no doubt at all that this court would suppress the confession as the result of an improper custodial interrogation. It would seem incongruous under a given set of facts, for a court to hold on the one hand that a defendant is in custody and must be accorded the full protection of the Fifth Amendment, and on the other hand, hold that a defendant is not in custody and that his constitutional protection under the Fourth Amendment may be violated. The Supreme Court of the United States warned in Boyd v. United States (116 U. S. 616) far back in 1885 that illegitimate and unconstitutional practices get their first foothold by variations from legal modes of procedure, and at page 635 cited the responsibility that courts have to be watchful for the constitutional rights of citizens and against any stealthy encroachment thereon.
This court, therefore, finds that the custody of the defendant Pounds was without probable cause, and that the seizure of his person, under the circumstances, violated the Fourth Amend *642 ment to the United States Constitution. The court further finds that the confessions by Pounds are the incident of this unlawful seizure of his person, and the fruit of official illegality, and must accordingly be suppressed; and I cite, for authority in that connection, Wong Sun v. United States (371 U. S. 471); GatLIn v. United States (326 F. 2d 666); Collins v. Beto (348 F. 2d 823); People v. Rodriguez (11 N Y 2d 279); People v. Herbison (22 N Y 2d 946); People v. Graff (59 Misc 2d 61).
Policies underlying the exclusionary rule do not invite any logical distinction between physical and verbal evidence (Wong Sun v. United States, supra, p. 485). Another case upholding the proposition that confessions which are the result of a defendant’s illegal detention by the police are inadmissible is McNabb v. United States (318 U. S. 332). The McNabb case, of course, declares that confessions are inadmissible if they are made during an illegal detention due to failure to carry the prisoner before the committing Magistrate, whether or not the confession was the result of torture, physical or psychological. Furthermore, the leading case of Mapp v. Ohio (367 U. S. 643, 655) mandates “All evidence” (the court’s emphasis) “obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court”. Nor does this court believe that i'ts holdings are nullified by this statement in Miranda v. Arizona (384 U. S. 436, 477-478): “ General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.”
It would not be proper to apply the above generalization to the Pounds situation as justification for the police to take him into custody on less than probable cause. It is patent from the record that the detectives considered Pounds more than a general witness, as described in the statement in Miranda, although they were not acting with probable cause as we have indicated before. The facts do not support a finding that Pounds was the ‘ ‘ focus ’ ’ of their investigation, since they were acting on some kind of information which was not disclosed or was not elaborated. They said, in fact, that he was not sought for the crime. In the case of United States v. Harrison (265 F. Supp. 660 [S. D. N. Y.]) the police officers came to the defendant’s home and suggested that the defendant accompany them to the station house. The defendant acceded to their request. *643 The court, in that case, determined that the defendant was in custody, overruling the prosecution’s contention that the defendant had voluntarily accompanied them to the station house. In the Harrison case, as in the case with which this court is dealing, two elements are present. One: the police officers physically came to get the defendant. Two: the defendant was given no alternative to the police station as the situs of the interrogation. Nor do we have a situation as presented in Hicks v. United States (382 F. 2d 158 [C. A., D. C.]), where the defendant initiated the investigation by calling the police and thereafter went to the police station to deliberately give misleading information to the police as to the perpetrators of the homicide.
Now, with regard to the defendant Shuman who went voluntarily to the precinct station — in fact, he made statements to his hostess, Mrs. Bernice Banks, that he wanted to stop running, or words to that effect, and was not going to run all of his life — we are here affected by the doctrine of the fruit of the poison tree. This court has no doubt that the defendant Shuman intended to go to make some kind of statement to the police touching his involvement in the alleged crime, but even when the detectives acted as they must have acted or ought to have acted in seizing and reaching for and holding the defendant Shuman, they had gained information from the illegal detention of the defendant Pounds which led unerringly to the defendant Shuman. Not to have seized the defendant Shuman would have been a dereliction of their duty. It was not for the policemen to determine whether a confession upon which they were taking an accomplice into custody is or is not admissible, or that a confession by one defendant cannot be used against the codefendant. That is. for judicial determination, and in respect of this court’s decision, there is no criticism or indictment of the police for seeking the perpetrators of crime. The court has its responsibility to discharge with regard to the Fourth and Fifth Amendments of the United States Constitution, and will do so.
Does Shuman’s confession come within the fruit of the poison tree doctrine? Nardone v. United States (308 U. S. 338, 341) discusses the fruit of the poison tree doctrine. The test of whether an item is the fruit of a poison tree is also discussed in. Wong Sun v. United States (supra, pp. 487-488) in which it is said, “ We need not hold that all evidence is ‘ fruit of the poisonous tree ’ simply because it would not have come to light but for the illegal actions of the police. Bather, the more apt question * * * is ‘ whether, granting establishment of *644 the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint ’. ’ ’
The exploitation of the Wong Sun test was described by the Supreme Court of California in People v. Bilderbach (62 Cal. 2d 757, 766), saying under the Wong Sun test, “ Evidence should not be excluded merely because it would not have been obtained but for the illegal search if the connection between such evidence and the illegal search has ‘ become so attenuated as to dissipate the taint. ’ If, however, the connection is not so attenuated and the evidence was ‘ come at by the exploitation of that illegality ’, then it is excludable.”
This court concludes that it is clear from the facts that Shuman’s confession was the result of the exploitation of the illegality on Pounds. The connection between the unlawful Pounds’ confession and the subsequent Shuman confession did not become so attenuated as to dissipate the taint. In Silverthrone Lbr. Co. v. United States (251 U. S. 385, 392) the court said, “ The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government’s own wrong cannot be used by it in the way proposed. ’ ’
This court is familiar and has read carefully the case of People v. Anonymous B and S (56 Misc 2d 792), in the County Court of Nassau County, that involved two youths charged with burglary. B confessed and implicated S in the crime. S thereafter confessed his part in the crime. The court in suppressing both confessions stated at page 799, “The court having herein determined to suppress any alleged inculpatory statement attributed to the defendant B upon the ground that the same was obtained in violation of the Fourteenth Amendment of the Constitution of the United States, anything therein contained is deemed part of the poisoned tree, ’ ’ and it -cited Silverthrone (supra) and Nardone (supra), and the court went on to say, “ B’s alleged implication of S is part of the poison tree, insofar as it led to S’s alleged confession, the latter must be barred as the fruit of the poisoned tree.” It cites Wong Sun. There is a contrary holding in Jacobs v. Warden, Maryland Penitentiary (367 F. 2d 321 [C. A. 4th, 1966]), where the court denied a defendant’s 'contention to suppress his con *645 fession based upon illegally obtained confession from a codefendant which implicated him. The court was of the opinion in that case that only the victim of the unlawful seizure had the right to object and strangers should not be cloaked with such protection.
This court finds, however, that Shuman’s confession is not admissible and was the fruit of the incriminating confession of Pounds, since it led to Shuman’s confession, confessing his participation in the homicide. For the fruit of the poison tree doctrine to be operative, a causal chain must be shown to exist from the primary illegality to the procurement of and the effect upon the substance of the evidence sought to be implied. Any causal chain that could have existed between Pounds and Shuman might have been broken by Shuman’s own acts, but we cannot find any real point of departure in the evidence to demonstrate that this was so.
I find that Shuman’s confession was knowingly made. The record is clear about that, that he did understand, that he probably went to the precinct station with the intention to disclose some information; but, by reason of the fact that the detectives who questioned him based their interrogation on what they had learned from Pounds, and since the confession of Pounds falls because his rights under the Fourth and Fifth Amendments were violated, the interrogation of Shuman was therefore illegal and anything he said must likewise fall. The separate confessions of Pounds and Shuman were so closely and inextricably interrelated that the tainted- confession of the former supplied the information which the police used to obtain the confession of the latter (cf. Wong Sun v. United States, 371 U. S. 471, 488, supra).
.This court finds, therefore, that the evidence adduced by the People in this hearing failed to sustain the People’s burden of proving beyond a reasonable doubt that the confessions by Pounds were the product of a rational and meaningful act of volition, or to state the proposition in another way, that the confessions were the product of a rational intellect and a free will; and we are, therefore, required to suppress the confessions of Pounds.
Therefore, the court orders that all oral and written statements made by the defendant Pounds be and the same are hereby suppressed and may not be used at the trial.
It is further ordered that all oral and written statements by the defendant Shuman are inadmissible in evidence and may not be used at the trial, because they are found to be the fruit of the poison tree; and it is further ordered that the Clerk is *646 directed to serve a co.py of the order with notice of entry and a copy of this decision on the defendants at the institution in which they are presently incarcerated, and upon their attorneys, and upon the District Attorney of Kings County.
Any documents, statements, including fingerprints which may have been taken from the defendant Pounds or the defendant Shuman are. covered by my order. I am making it as broad as that in order to afford the District Attorney the opportunity to appeal from the whole order and not to have to repeat this process. [See. also, 63 Misc 2d 818.]