**STATE of Iowa ex rel. Jack M. FULTON, County Attorney, Linn County, Iowa, Appellee,**

v.

**Oscar William SCHEETZ, Jr., Appellant.**

**No. 53068.**

Supreme Court of Iowa.

April 8, 1969.

R. Fred Dumbaugh, Cedar Rapids, and Samuel M. Fahr, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., David A. Elderkin, Asst. Atty. Gen., and Stephen B. Jackson, Cedar Rapids, Asst. Linn County Atty., for appellee.

SNELL, Justice.

Pursuant to chapter 225A, Code, 1966, the Linn County Attorney filed a petition asking that defendant, Oscar William Scheetz, Jr., be adjudged a criminal sexual psychopath. Defendant answered denying all material allegations. Trial to jury resulted in a verdict finding defendant to be a criminal sexual psychopath. He was thereupon ordered committed to the Mental Health Institute at Independence. From that order of commitment, defendant appeals. We affirm.

Errors relied on for reversal are: (1) failing to dismiss the proceedings on receipt of the medical examiner's report; (2) overruling defendant's motion to dismiss; (3) overruling objections to testimony of police officer relative to his interrogation of defendant; (4) overruling objection by defendant to a hypothetical question put to a doctor; (5) overruling defendant's motion for a directed verdict; (6) giving instructions 4 and 9 with reference to burden of proof; and (7) overruling defendant's motion for a new trial.

These contentions will not be considered in the order assigned.

I. Prior to trial defendant filed a motion to dismiss alleging chapter 225A violates Amendment 14, Constitution of the United States, and Section 1, Article 1, Constitution of Iowa. He claims the Act serves to deny due process and equal protection under the law.

We will uphold the provisions of the Act if such is constitutionally permissible.

■ Where a statute is fairly subject to differing constructions, one of which will render it constitutional, the other unconstitutional or of doubtful constitutionality, that construction by which it may be upheld will be adopted. Zilm v. Zoning Board of Adjustment, Iowa, 150 N.W.2d 606, 609–610; State v. Ramos, Iowa, 149 N.W.2d 862, 865; Powers v. McCullough, 258 Iowa 738, 745–746, 140 N.W.2d 378; and Graham v. Worthington, 259 Iowa 845, 850–851, 146 N.W.2d 626.

■ In construing statutes, courts may properly consider the evil sought to be

remedied and the objects or purposes the legislative enactment seeks to obtain. State v. Ricke, Iowa, 160 N.W.2d 499, 501, and Edge v. Brice, 253 Iowa 710, 718, 113 N.W.2d 755.

■ The objectives of criminal sexual psychopath statutes are to, (1) protect society by sequestering the deviate so long as he remains a menace to others, and (2) subject him to treatment to the end he may recover from his existing psychopathic condition and be rehabilitated. See 24 A.L.R. 2d 350, 351.

■ Chapter 225A is a humane, valid and proper exercise of the state's police power as a measure of public safety. Cullins v. Crouse (10 Cir.), 348 F.2d 887, 889; People v. Piasecki, 333 Mich. 122, 52 N.W. 2d 626, 629–630; State v. Madary, 178 Neb. 383, 133 N.W.2d 583, 587, and Annos. 24 A.L.R.2d 350, 354.

Admittedly there are those who vigorously dispute the wisdom and propriety of such legislation. See 43 Calif.L.Rev. 766, 769; 41 Iowa L.Rev. 523. Treatment has not been universally successful.

■ However, the judicial branch of government has no power to determine whether legislative Acts are wise or unwise, nor has it the right to declare an Act void unless it is plainly and without doubt repugnant to some provisions of our Federal or State Constitutions. Graham v. Worthington, supra, loc. cit. 259 Iowa 850–851, 146 N.W.2d 626.

Under Code chapter 225A the county attorney may file a verified detailed petition, upon information or belief, against "any person * * * charged wtih a public offense" reasonably believed to be a criminal sexual psychopath. Upon the filing of such petition the defendant must be given written notice of the charges against him and thereupon the court "shall determine whether he shall be medically examined." Provision is then made for a medical examination of defendant and the filing of a con-fidential written report by such examiner, a copy of which shall be delivered to defendant or his attorney. If the court finds, upon examination of the petition and medical examiner's report, there is sufficient showing of a mental disorder to which criminal sexual propensities are attributable, trial of the case shall be ordered, but if such showing is not made the case is to be dismissed. It is also required defendant have counsel at every stage of the proceedings and if he has none, the court shall appoint a competent attorney to represent him. He may also be released on bail. Defendant is entitled to a jury trial upon request, and in the conduct of any hearing the examining physician may testify, but his written report, previously filed with the court, is not admissible in evidence. If defendant is adjudged a sexual psychopath the court may commit him to a state hospital for the mentally ill to be there detained until released. Provision is also made for appeal. The staff of the hospital to which defendant may be committed is required to periodically examine defendant and report on his progress to the committing court, at least once each year. A rehearing shall be held in the court of original commitment whenever a written application is presented indicating defendant has, in the opinion of three designated psychiatrists, improved to the extent that "his release will not be incompatible with the welfare of society."

This at once demonstrates the Iowa Act serves to supply those procedural safeguards found fatally lacking in Specht v. Patterson, 386 U.S. 605, 610–611, 87 S.Ct. 1209, 1212–1213, 18 L.Ed.2d 326, discussed, infra.

Without question there are those violators of the criminal law whose criminality is attendant upon or related to mental abnormalities. See State v. Arthur, Iowa, 160 N.W.2d 470, and State v. Harkness, Iowa, 160 N.W.2d 324.

Apart from those so classified is another group who, though mentally responsible, are

either sociologically or emotionally unable to control their sexual behaviorisms. Those in this category demonstrate a tendency to repeat their antisocial activities to a point of criminality, but should not, by reason thereof, be subjected to penological treatment. While constituting a menace to the peace and safety of others, they are suffering from a psychopathic, or sociopathic, disorder and should resultantly be accorded treatment leading to rehabilitation, not punishment as that term is ordinarily applied in the field of criminal law.

Persons within the class segregated by Code chapter 225A are those preliminarily charged with a public offense who have manifested a mental or emotional inability to control their sexual activities to such a point as to constitute a danger to society.

■ The state has authority under its police power to restrain the liberty of any person coming within such a class provided such restraint is premised upon a constitutionally proper legislative enactment.

■ The United States Supreme Court said in Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620: "Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. Walters v. City of St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660. Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, * * *."

Procedural steps required by chapter 225A provide due process of law.

II. The statutory definition set forth in section 225A.1 is sufficiently certain to permit practical application within constitutional limitations.

The Act provides: "All persons charged with a public offense, who are suffering from a mental disorder and are not a proper subject for the schools for the mentally retarded or for commitment as a mentally ill person, having criminal propensities toward the commission of sex offenses, and who may be considered dangerous to others, are hereby declared to be 'criminal sexual psychopaths'."

The case of People v. Nunn, 46 Cal.2d 460, 296 P.2d 813, 817–818, cert. den. and appeal dismissed 352 U.S. 883, 77 S.Ct. 126, 1 L.Ed.2d 82, involved an accused, a physician, convicted of prescribing narcotics for a person not under his treatment for a pathology and for a person representing himself to be an addict. This was prohibited by statute, "except in the regular practice of his profession". Defendant contended the Act was too vague, indefinite and uncertain to give reasonable notice as to conduct thought to be prohibited. In holding such contention devoid of merit the court said: " * * * To comply with the constitutional requirement of due process of law, the crime for which defendant is being prosecuted must be clearly defined, but *it is only necessary that the words used in the statute be well enough known to enable those persons within its purview to understand and correctly apply them.*" (Emphasis supplied.)

Unavoidably broad, the Iowa Statute is applicable to all persons charged with the commission of a public offense, suffering from a mental disorder, with criminal propensities toward the commission of sex offenses, who may be dangerous to others, specifically excluding mentally retarded or mentally ill persons.

The question posed is not whether section 225A.1 is in precise harmony with those variant interpretations which members of the medical profession may have applied. See People v. Levy, 151 Cal.App.2d 460, 311 P.2d 897, 902.

The problem to be resolved by us is whether the Act here challenged meets constitu-

tionally required standards of certainty in the ordinary or legal sense.

Section 225A.1 embraces within its terms all persons prefatorily charged with the commission of a public offense, who by a course of conduct in sexual matters, have evidenced a lack of power to effectively control their sexual impulses and are likely to criminally attack, assault or otherwise inflict injury, pain or other evil on the objects of their uncontrolled and uncontrollable desires. This does not mean the provisions of chapter 225A apply to every person guilty of sexual misconduct, nor to those having strong but inoffensive sexual propensities. In fact their inclusion within the scope of the Act would make its enforcement impracticable.

As stated in Powers v. McCullough, 258 Iowa 738, 746, 140 N.W.2d 378: "Regularly enacted laws are presumed to be constitutional, and this presumption must be overcome by one attacking a statute by proving its invalidity beyond a reasonable doubt."

An examination of the record discloses defendant has not established the unconstitutionality of Code section 225A.1 by the requisite degree of proof.

III. Defendant also contends the action against him should have been dismissed on the filing of a medical report following the court ordered examination by Dr. J. H. Hege, Director of the Security Hospital, Men's Reformatory, Anamosa.

That report is too thorough and extensive to be here repeated at length. In material part the doctor states:

"There is no evidence available from this evaluation that our patient is or has been psychotic or has experienced any break in contact with reality. His disorder lies in the area of lack of socialization. His personality structure and dynamics provide the necessary ingredients to provide the unconscious motivation, making him capable of engaging in this sexual behavior which he is alleged to have perpetrated. However, unconscious motivation does not by our interpretation constitute propensity. The injection of legal considerations combined with the considerations presented in this report is from our standpoint necessary to make a determination of sexual psychopathy.

"Prognosis would seem to be guarded. Again the ingredients for antisocial behavior are present but firm prediction of future behavior is impossible. Applying the laws of probability to Mr. Scheetz's specific personality structure and dynamics as well as past history, one would have to assume that unless something intervenes to change his pattern, the probabilities favor further antisocial behavior.

"Insofar as intervening forces are concerned, if Mr. Scheetz is sincerely motivated to look at his basic problems, his high level of intelligence will certainly stand him in good stead. If not incarcerated he will need individual counseling or therapy."

Code section 225A.8, provides: "After the filing of the report of the medical examination, if sufficient proof be not made to the court of the criminal propensities to the commission of sex offenses of the person charged with criminal sexual psychopathy, or if the report of the examining physician or physicians does not establish the fact of a mental disorder to which such propensities are attributable in the person examined, the court shall dismiss the petition. If sufficient proof be made to the court of the criminal propensities to the commission of sex offenses of the person so charged, and if the report of the examining physicians does establish the fact of a mental disorder to which such propensities are attributable in the person examined, the court shall order that a final hearing pursuant to the order of continuance be held on the petition setting the time and place of such hearing."

Defendant argues that the medical report failed to specifically disclose such

evidence of criminal propensities as to justify an order for trial.

This argument again opens the door to an existing and often presented conflict, sometimes classified as semantical in nature, between legal and medical practitioners.

If the Act were to be construed as applicable only to psychotics few, if any, persons would be subject to its provisions because the statute excludes those mentally retarded or mentally ill.

 Neither courts nor juries are bound by superimposed definitions or conclusions as to the meaning attributed to "disease" or "defect" by medical experts. What psychiatrists may consider a "mental disease or defect" for clinical purposes, where their concern is treatment, may or may not be the same as "mental disease or defect" for the purpose of determining criminal propensities toward the commission of sex offenses of such nature as to be dangerous to others.

 Although the judiciary holds opinions of medical experts in high regard, it cannot abdicate the authority, and duty, to view them in the light of legally established standards. State v. Arthur, supra, 160 N.W.2d loc. cit. 474–479, and State v. Harkness, supra, 160 N.W.2d loc. cit. 330–337.

The trial court found, upon the basis of Dr. Hege's report, defendant's unconscious motivations disclosed sufficient proof of such criminal propensities for the commission of future sexual offenses, dangerous to others, as to justify a trial on the issue.

 It is generally understood many sex offenders are not insane within the ordinary accepted legal test, but are usually suffering at most from a neurotic character disorder. See State v. Arthur and State v. Harkness, both supra.

 We find no basis upon which to conclude trial court erred in ordering the case proceed to trial upon submission of Dr. Hege's medical examination report.

We find no error on the part of trial court in overruling defendant's motion to dismiss.

IV. Defendant asserts his objection to a hypothetical question propounded to plaintiff-called psychiatrist, Dr. John Hege, should have been sustained.

At the close of that question, too lengthy to be here repeated, the witness was asked: "Doctor, assuming all of these facts to be true, do you have an expert opinion as to whether or not the defendant, Oscar William Scheetz, Jr., is a sexual psychopath?" The witness then answered "Yes", whereupon the following occurred:

"MR. DUMBAUGH: Just a minute, Your Honor, I am going to object to that question on the grounds that it calls for an ultimate conclusion of fact which the Jury in this particular case has been selected to find. I feel that this expert—highly qualified expert witness is more than able to testify concerning observations that he made of this particular defendant, I feel that he is qualified to testify as to other observations or conclusions that he might have, however, allowing ,him to answer this particular question which is in fact the ultimate question in issue in this case, would go far beyond the proper scope of this witness and that it would be highly prejudicial to this defendant. The Jury has been impaneled to find this particular question—

" * * *

"MR. DUMBAUGH: We further object to it on the grounds that there has been no definition offered or proffered to the Court or to this witness as to what in fact, is a sexual psychopath. We further object to the question on the grounds that it goes far beyond the proper scope of examination in this case. There has been no proper foundation established, it is in-

competent, irrelevant and immaterial and that it asks for a conclusion from this witness upon which insufficient facts have been established.

"THE COURT: The objection is noted and it is overruled. Proceed.

"Q. Doctor, do you recall the question? A. Yes, sir.

"Q. The hypothetical question? A. (Nods head yes)

"Q. And do you have an opinion assuming all of these facts in the hypothetical question as being true, as to whether Oscar William Scheetz, Jr., the defendant, is a sexual psychopath? A. I have an opinion.

"Q. Can you tell us what that opinion is, Doctor? A. Based on the facts as you have presented them it seems they met all of the criteria as established by the Code of Iowa and that he would have to be determined a criminal sexual psychopath."

Defendant, procedurally, has no cause for complaint. His objection was either too late or too early; it operated in a vacuum.

■ Without challenge, Dr. Hege first stated he had an opinion about which inquiry was being made. This was followed by an objection. However, if defendant intended to challenge the prior question relative to existence of an opinion, but could not do so because the witness responded too fast, his objection, even if sustained, would not alone have served to strike or exclude the response given. As this court said in Correll v. Goodfellow, 255 Iowa 1237, 1247, 125 N.W.2d 745, 751: "No motion was made to strike or exclude the quoted answer. The objection was not made until after the answer was in and no reason was given for the delay. The ruling did not have the effect of striking the testimony. It remained in the record and is to be considered. (Authorities cited.)" See also McDannel v. Parkview Inv. Corp., 257 Iowa 1160, 1165, 136 N.W.2d 281; Barnard v. Cedar Rapids City Cab Co., 257 Iowa 734, 756–757, 133 N.W.2d 884; Castner v. Wright, 256 Iowa 638, 652, 127 N.W.2d 583, 128 N.W.2d 885; Sallee v. Routson, 247 Iowa 1220, 1222–1223, 78 N.W.2d 516.

If the objection made was in anticipation of the question to follow, it came too soon, there being no subject upon which it could fasten—no basis upon which it could stand.

In any event counsel for plaintiff, subsequent to defendant's objection, again inquired as to whether Dr. Hege had an opinion, to which affirmative answer was given.

The witness was then asked to state his opinion. No objection was made and he answered.

Conceding for the purpose of discussion the expert witness, in so answering, volunteered a combined statement of law and fact and went beyond the scope of the question, no motion was made to strike or exclude it.

Under all the circumstances, Dr. Hege's answer stood and defendant's complaint comes too late for consideration on appeal.

■ In State v. Jones, 253 Iowa 829, 834, 113 N.W.2d 303, 306, we said:

"Failure to object to the admissibility of evidence in the trial court waives any error therein and its admissibility is not reviewable here. * * *

"We have recently commented on the failure to properly present claimed errors to the trial court. State v. Pullen, 252 Iowa 1324, 110 N.W.2d 328; and State v. Kramer, 252 Iowa 916, 109 N.W.2d 18. * * *

"Section 793.18 does require us to examine the record without regard to technical errors or defects which do not affect the substantial rights of the parties. But we have held this statute inapplicable where objections to evidence have been

waived. State v. Ostby, 203 Iowa 333, 342, 210 N.W. 934, 212 N.W. 550."

We conclude defendant has no standing at this time to effectively complain with regard to the admission in evidence of Dr. Hege's ultimate conclusion. This also means we are not now called upon and do not reach or resolve the propriety of such testimony had appropriate and timely objection been made.

V. Defendant claims trial court erred in permitting Detective Leland Meikle to testify regarding statements made to him by defendant in the course of a pretrial interrogation. Over defendant's timely objections, based on the premise defendant, then restrained of his liberty, was not given the constitutionally required Miranda warnings, the objections were overruled and Detective Meikle stated in detail his questioning of defendant, answers given and statements made.

We quote from the record:

"My name is Leland Meikle. I am a detective for the Cedar Rapids Police Department. In my official capacity I have had occasions to investigate matters involving the Defendant, Oscar William Scheetz, Jr. On January 30, 1966 at approximately 7:30 P.M., I had occasion in my official capacity to question the Defendant, Oscar William Scheetz, Jr., relative to an incident involving a Carol Nuehring.

"Q. All right, can you tell us from the start what you discussed with Oscar William Scheetz, Jr.?

"MR. DUMBAUGH: Just a minute, Your Honor, at this time I would request permission from the Court to Voir Dire this witness.

"THE COURT: Proceed.

"VOIR DIRE

"BY MR. DUMBAUGH:

"Q. Officer prior to this discussion with Mr. Scheetz did you at any time advise him of any of the rights that a person has as far as making incriminatory or possibly incriminatory statements? A. Yes, sir, I did.

"Q. What rights did you advise him of? A. I advised him that he had a right to an attorney, to have him present and he could telephone if he wanted. A. (continuing) could telephone for an attorney and anything he said would be strictly voluntary and that he didn't have to tell me anything unless he wanted to.

"Q. Did you advise the person that in the event he was unable to afford or privately retain an attorney that the Court would appoint him one? A. No sir, at that time that was before the Miranda decision came out and we were not required to advise him of that particular statement at that time.

"* * *

"Mr. Scheetz told me that on November 15, 1965 he owned a 1965 white Chevrolet. That he had been driving this car in the area of the telephone company, 3rd Avenue and 6th Street S. E., and that he had seen a girl, Miss Nuehring, walking from the telephone company and walking south on 6th Street S. E. He further said he pulled his car into the curb and stopped and talked to Miss Nuehring and told her that his name was Bill Smith and asked her how things were at the telephone company, how she had been and so forth. He then stated that he would like to talk further with her and she continued walking on down the street. About a week later he was down driving his same car in the same area and had parked the car in a parking lot just off of 6th Street and went into the laundromat at 5th Avenue and 6th Street. He further stated that he had been in there a few minutes and then saw Miss Nuehring walking on 6th Street again and that he met her just as she was coming out of the laundromat. He further stated that he approached her, told her he was Bill Smith, asked if she didn't remember him and when she started to walk

off, he placed his hand on her shoulder and at that time she started to scream and he then put his hand over her mouth and told her that he would let her go if she would become quiet which she did and he released her, she left and he took off running to his car which was parked in the lot and then drove home. He further told me that on another date, the exact date of which had slipped his mind, he again was driving his Chevrolet automobile near 7th Street just south of 3rd Avenue and there was a lady walking from the phone company toward her car. That he stopped and talked to this lady and told her that he was Bill Smith and said a few words to her and she then left. He couldn't remember the lady's name but we later determined the lady's name to be a Mrs. Henecke who lived on Ravenwood Drive North. She also identified Mr. Scheetz and stated that Mr. Scheetz' car was of the same make and model and color that the subject was driving that talked to her on the night in question.

"Q. All right. Officer, did you discuss that evening of January 30, 1966 with Oscar William Scheetz, Jr., any incident that might have occurred in Iowa City, Johnson County, Iowa? A. Yes, sir. I talked to him about two assaults, two rapes that had taken place in Iowa City and he stated that he had been in Iowa City on the days or close to the days that these incidents took place and that he had given two different girls a ride in his car down there.

"Q. All right. Now did you discuss these two different rides in Johnson County with Oscar Scheetz? A. In some detail, not too much. I asked him where he had taken the girls, where they had ridden around and he stated that out near the edge of the city or out in the country, but he couldn't remember exactly and then returned to town.

"Q. Did he state anything else regarding any incidents in Johnson County, Iowa? A. No, just the two girls that he had given rides to on the separate occasions.

"Q. Did you, in discussing these matters with Oscar William Scheetz, Jr., inquire as to whether or not he had any acts of sexual intercourse with either of these girls in Johnson County, Iowa? A. No, I did not. A. At that time I didn't get the chance to, we were interrupted and that particular time the questioning was halted about the Iowa City incidents.

"Q. Did you later that evening continue your discussions with Oscar William Scheetz, Jr.? A. Yes, Well, in a few minutes or approximately ten minutes later I again asked him or attempted to continue the questioning about the Iowa City incidents and from that time he wouldn't tell me any more facts about what had taken place or wouldn't answer any of my questions in regards to those incidents.

"Q. Did you ask the Defendant specifically about whether he had had sexual relations with either of these girls in Johnson County? A. Yes, I put the question to him and he didn't reply one way or the other. The only thing he had done was placed his head on the desk and started to sob.

"Q. How long did he sob? A. Probably two or three minutes."

In considering the claim of error in the admission of this testimony the purpose of the act, the status of defendant at the time of interrogation and the nature of prosecution here involved must be considered.

The police were investigating a number of assaults that had taken place. Defendant was asked to come to the police station and was there questioned in connection therewith. It was a "critical stage" in those investigations. However, there is nothing in the record before us to indicate that defendant has been prosecuted for any of those offenses. From a practical premise defendant has been the beneficiary of therapeutic beneficence rather than extensive imprisonment. The situation is in extreme contrast with Gault, discussed in a subsequent division.

In the case at bar the prosecution proceeded under the criminal psychopath act. The defendant was committed for treatment of his ailment. While the treating psychiatrists made no definite prognosis, improvement and progress toward a cure was noted and defendant has been released on probation. Had defendant been initially tried and convicted of the offenses disclosed in this trial he would have faced imprisonment under two life sentences in addition to lesser punishments. They included two separate rapes by force.

There is no suggestion that defendant has ever been denied or unable to obtain counsel. He has been ably represented in the trial court and on appeal by able counsel including a professor of law. The record indicates the verdict in this case did not depend on any in-custody gained information extracted from defendant against his will.

Top psychiatrists admit that results obtained so far under our law have been less than satisfactory. If we recognize too much impedimenta in its operation the result will be abandonment rather than improvement of a "noble experiment" and resort to imprisonment rather than hospitalization. For an extensive discussion of sexual psychopath laws, their noble purpose, the fallacies on which they are based, the difficulties inherent therein, their failures and doubtful future, see "Iowa's New Sexual Psychopath Law—An Experiment Noble in Purpose?" by Professor Samuel M. Fahr in 41 Iowa Law Review 523. On page 557, these words appear:

"The chance of any really significant progress through the 'sexual psychopath laws' is small indeed.

" * * * It may be that even so poor a law as this is better than punishment alone, but no one should be deceived by the existence of the Iowa 'Criminal Sexual Psychopath Law' of 1955: we are still many light years from the 'Brave New World.' "

It should be kept in mind that as a prerequisite to the filing of a criminal sexual psychopath charge the defendant must be *charged* with a public offense. It does not depend on conviction. It is not a recidivist statute providing for enhanced punishment as appears from the statutes in some other jurisdictions.

 What is the purpose of our statute? Our criminal sexual psychopath law is not a criminal statute comparable to the ones considered in other jurisdictions. The law is not punitive in nature and is not based upon proof of guilt or specific acts which would be punishable under other statutes. The law is therapeutic and designed not only for the protection of the public, but for the protection of the accused against punishment for acts beyond his control. The trial does not determine the accused's guilt or innocence of anything, but rather is for the purpose of curing a condition.

The procedure and purpose might be compared with the determination of mental illness, inebriety or drug addiction, and the procedure outlined in chapter 229 of the Code or even the quarantine authorized and provided in the case of contagious and infectious diseases outlined in chapter 139.

The chapter on commitment of mentally ill, drunkards and addicts provides for the appointment of counsel and for all of the procedures for appeal, but we doubt if a commitment would be reversed because of a failure to show full compliance with every requirement of Miranda.

 We do not think it would be seriously contended that a person suffering from a quarantinable disease should be given all of the Miranda warnings before he can be isolated, by force if necessary, or that in the absence of such warning he should be turned loose to expose others to danger. Should a drunkard or addict who might be cured by treatment be turned loose to continue self-destruction because the police failed to tell him that the state

would pay for an attorney? We think not. It is generally recognized that the State has authority under its police power to restrain the liberty of any person coming within such a class provided such restraint is premised upon a constitutionally proper legislative enactment.

The verdict is not and cannot be the basis for imprisonment for anything disclosed therein, nor would it be the basis for a claim of double jeopardy. It might form the basis for a defense of insanity or irresistible impulse in the event of another prosecution.

The basic question before us is whether a determination that a defendant is a sexual psychopath and resultantly subject to treatment by a psychiatrist or psychologist should be reversed because in connection with pre-arrest inquiries about specific offenses he was not advised that he would be furnished counsel at state expense.

We are not now reviewing a conviction of those specific offenses. We do not think the Miranda rules need to be amplified to the extent of requiring reversal here. See State v. Lewis, 274 N.C. 438, 164 S.E.2d 177, 186 and State v. Johnson, 3 N.C.App., 420, 165 S.E.2d 27, 28.

VI. Who is a criminal sexual psychopath? The definition is statutory.

Definition of the term "sexual psychopath" is more difficult.

Dorland's Illustrated Medical Dictionary, 24th Edition, (1965), defines the term "Psychopath" as: "A person who has a psychopathic personality * * *, an individual whose sexual behavior is manifestly antisocial and criminal." Another definition of the term "Psychopath" is found in Stedman's Medical Dictionary, 21st Edition (1966), wherein it is stated: "The subject of a psychoneurosis; especially one who is of apparently sound mind in the ordinary affairs of life, but who is dominated by some abnormal sexual, criminal, or passional instinct."

The Medico-Legal Journal (Part Four, 1967), contained an article by Dr. J. Stuart Whiteley, entitled "Concepts of Psychopathy and Its Treatment." At page 155, Dr. Whiteley states: "Thus our concept of a psychopath is of a person apparently without a knowledge of social interactions, unaware of the feelings of others, oblivious to the rules of the group, infantile and egocentric in his demands, unable to withstand frustration or denial of gratifications, unable to see another's point of view, impulsive to a primitive and childlike degree, without foresight and a total denial of responsibility for the results of his actions. * * * In many ways the psychopath is more akin to the psychotic and particularly the schizophrenic. Both are isolates, autistic, emotionally unfeeling, guarded against a world felt to be hostile and subject to fantasy substitutions for the real life traumata. * * * In psychopathy the earliest signals of communication between humans—between mother and child, parents and child, family and child, school fellows and child, adult world and child—are received but are misunderstood. This pattern of ill-learned social interaction is subsequently carried into adult life. When the developing individual finds himself in a world which he misinterprets as inimical he escapes into psychopathic behavior as a defense against the trauma, anxiety and social pressures and demands."

Applying the above language to what is known in the law as a criminal sexual psychopath, it can be said there are those violators of the criminal law whose criminality is attendant upon or related to mental abnormalities. However, apart from those so classified is another group who, though mentally responsible, are either sociologically or emotionally unable to control their sexual behaviorisms. Those in this category demonstrate a tendency to repeat their antisocial activities to a point of criminality, but should not, by reason thereof, be subjected to penological treatment. While constituting a menace to the peace and safety of others,

they are suffering from a psychopathic, or sociopathic, disorder and should resultantly be accorded treatment leading to rehabilitation, not punishment. Toward such persons chapter 225A is a hopeful gesture.

The hoped for result being that both the wrongful actor and particularly society, benefit from the commitment and the resultant therapeutic treatment.

The Miranda rules apply to those charged with, or interrogated for the purpose of charging them with a crime. Nonprejudicial noncompliance such as we have here should not thwart a procedure that is therapeutic and not punitive.

VII. Our statute (section 225A.9) says the action shall be tried as a special proceeding. It is more in the nature of a trial to determine mental illness under chapter 229 than a criminal prosecution. In its purpose it is more civil than criminal.

Historically various courts have adopted differing positions as to the nature of sexual psychopath trials, many being understandably based upon precedent alone. Some have said they are civil in nature. Others say, though classified as civil, they more closely resemble criminal prosecutions in many critical respects.

The Supreme Court of Nebraska in State v. Madary, 178 Neb. 383, 133 N.W.2d 583 in considering sexual psychopath statutes, said:

"They represent a new approach, reflecting the thinking of modern psychiatry and psychology, in that they provide civil commitment, segregation, and treatment of the sexual psychopath rather than criminal punishment, whose ineffectiveness as a deterrent has been demonstrated by the number of sex offenders who have repeated their offenses after criminal conviction." (loc. cit. 587 of 133 N.W.2d)

In Thurmond v. Superior Court of Solano County, 49 Cal.2d 17, 314 P.2d 6, 8, this appears:

"The sexual psychopathy law provides for separate proceedings of a civil nature for the purpose of protecting society against the activities of sexual psychopaths and at the same time affording a means whereby a person found guilty of a criminal offense may be aided by medical treatment."

The article by Professor Fahr, supra, in speaking of such statutes, says, "They are uniformly held non-criminal, despite the fact the persons they operate on consider them punitive in nature." (loc. cit. 554 of 41 Iowa Law Review)

 It is axiomatic that where liberty is to be restrained there must be due process but we cannot say that defendant in this case and under a statute of this nature has been denied due process

The assaults, molestations and rapes inquired about at the police station were testified to by other witnesses except for the testimony that defendant placed his head on the desk and sobbed. The testimony was merely cumulative. It was not even necessary for corroboration. Defendant was not on trial for those offenses. All warnings had been given defendant except the supplemental advice that the court would appoint an attorney for him. The statements made were voluntary. There were no threats. There was no third degree abuse physically or psychologically. Defendant has had counsel as soon as he desired. This case does not rest on inculpatory statements. Defendant's complaint about violation of his constitutional rights is too anemic to require reversal.

VIII. Numerous authorities might be considered but main reliance of appellant is upon a few leading cases applying due process rules. They are clearly distinguishable from the case at bar.

In 1964 the landmark case of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, held that when a person is held in police custody, and when police

inquiry has turned from investigatory to accusatory, that person is entitled to the aid of counsel. The language used therein gave rise to much speculation as to the authority of the officers and the rights of an individual suspected of crime. It did represent a significant departure from the established precedent of "voluntariness" as the test for admission of confessions. See 53 Iowa L.Rev. 1074.

Later, the Supreme Court in Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, extended the term "custody" to mean when one is placed under arrest or is otherwise deprived of his freedom of action in any significant manner. Again, the case involved one suspected of committing a crime. Due process, the court said, in such cases required that the suspect be advised that (1) he has a right to remain silent, (2) any statement he makes may be used against him in evidence, (3) he has a right to presence of counsel, and (4) if he cannot afford counsel, one will be appointed for him.

Much speculation and litigation has arisen as to the application of this pronouncement. As applied to one accused of a crime, the holding is clear. As to its application to other cases involving treatment and not punishment we have a different situation. We have discussed the noncriminal nature of our act. Although there is language in some decisions which would seem to require this warning in any administrative civil or judicial proceeding involving custodial restraint of an individual, we do not believe the rule should be extended to a situation that is neither punitive as Escobedo, Miranda, Gault and Mathis, infra, or recidivist as Specht, infra.

▪ It has always been assumed that a state legislature can act within its police power to single out for special treatment the paranoid, the mentally ill, or the sexually dangerous person from the larger class of sex crime offenders. State of

Minn. ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744.

We believe it would be a serious mistake to extend Miranda into an area which is not adaptable in theory or practice to the Miranda guidelines, specifically aimed at criminal prosecutions.

▪ Miranda seeks to safeguard the rights of persons suspected of a crime and rightfully excludes evidence obtained without complying with its guidelines. Had the case at bar been a prosecution for a crime, the statements in question, we are agreed, would be inadmissible. Although it is true that under our sexual psychopath statement, as a prerequisite, a person must be charged with a public offense before he can be adjudged a sexual psychopath, this prerequisite does not require a conviction on the charge and should not be controlling on the vital issue as to whether Miranda applies.

The adoption of appellant's theory would result in discouraging prosecutors from helping sexual psychopaths through the use of our statute and encourage penal retribution, the very thing the statute is aimed at preventing, or, in other words, all but destroy the act and its purpose.

Specht v. Patterson, supra, held the Colorado Sex Offenders Act deficient in due process as measured by the requirements of the Fourteenth Amendment. The attack upon the act was that the "procedure does not satisfy due process because it allows the critical finding to be made under § 1 of the Sex Offenders Act (1) without a hearing at which the person so convicted may confront and cross-examine adverse witnesses and present evidence of his own by use of compulsory process, if necessary; and (2) on the basis of hearsay evidence to which the person involved is not allowed access. * * *

"The Sex Offenders Act does not make the commission of an enumerated crime the basis for sentencing. It makes one conviction the basis for commencing another pro-

ceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. That is a new finding of fact (Vanderhoof v. People of State of Colorado, 152 Colo. 147, 149, 380 P.2d 903, 904) that was not an ingredient of the offense charged. The punishment under the second Act is criminal punishment even though it is designed not so much as retribution as it is to keep individuals from inflicting future harm. United States v. Brown, 381 U.S. 437, 458, 85 S. Ct. 1707, 14 L.Ed.2d 484.

"The Court of Appeals of the Third Circuit in speaking of a comparable Pennsylvania statute said:

" 'It is a separate criminal proceeding which may be invoked after conviction of one of the specified crimes. Petitioner therefore was entitled to a full judicial hearing before the magnified sentence was imposed. * * *'

" * * * Under Colorado's criminal procedure, here challenged, the invocation of the Sex Offenders Act means the making of a new charge leading to criminal punishment. The case is not unlike those under recidivist statutes where an habitual criminal issue is 'a distinct issue' (Graham v. West Virginia, 224 U.S. 616, 625, 32 S.Ct. 583, 56 L.Ed. 917) on which a defendant 'must receive reasonable notice and an opportunity to be heard.' Oyler v. Boles, 368 U.S. 448, 452, 82 S.Ct. 501, 7 L.Ed.2d 446; Chandler v. Fretag, 348 U.S. 3, 8, 75 S.Ct. 1, 99 L.Ed. 4. Due process, in other words, requires that he be present with counsel, have an oppportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed. * * *"

Our statute is not comparable to the Colorado statute. The due process protections absent there are in our statute. Their statute is recidivist in nature based on a prior conviction and providing for additional punishment. There is nothing in the Specht opinion that requires a reversal here.

Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 is important in its area but our case is not in that area. This appears:

"In the first place, juvenile proceedings to determine 'delinquency', which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings. * * * For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil'. And our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty—a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom."

Gault was a juvenile court proceeding wherein on the basis of hearsay and in court interrogation of the boy by the court and without aid of counsel the boy was declared a delinquent because of rather minor misdemeanors. His commitment and the proceedings leading thereto were challenged because the following basic rights were denied:

"1. Notice of the charges;

"2. Right to counsel;

"3. Right to confrontation and cross-examination;

"4. Privilege against self-incrimination;

"5. Right to a transcript of the proceeding; and

"6. Right to appellate review."

The opinion considers at length juvenile court procedures and their purpose. We quote excerpts therefrom:

"Ultimately, however, we confront the reality of that portion of the juvenile court process with which we deal in this case. A boy is charged with misconduct. The boy is committed to an institution where he may be restrained of liberty for years. It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 're-ceiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. * * *

"Under our Constitution, the condition of being a boy does not justify a kangaroo court. The traditional ideas of juvenile court procedure, indeed, contemplated that time would be available and care would be used to establish precisely what the juvenile did and why he did it—was it a prank of adolescence or a brutal act threatening serious consequences to himself or society unless corrected? * * * The essential difference between Gerald's case and a normal criminal case is that safe-guards available to adults were discarded in Gerald's case. The summary procedure as well as the long commitment were possible because Gerald was 15 years of age instead of over 18.

"If Gerald had been over 18, he would not have been subject to Juvenile Court proceedings. For the particular offense immediately involved, the maximum pun-ishment would have been a fine of $5 to $50, or imprisonment in jail for not more than two months. Instead, he was com-mitted to custody for a maximum of six years. * * * So wide a gulf between the State's treatment of the adult and of the child requires a bridge sturdier than mere verbiage, and reasons more persuasive than cliché can provide. * * *

" 'We do not mean * * * to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment.' * * *"

The court was prompted to quote Dean Pound, "The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts * * *."

Gault and our case are in no way com-parable. There with no semblance of due process punishment was immeasurably en-hanced.

None of the procedures condemned in Gault appears in our case. The exact op-posite appears. Defendant has had the benefit of the most lenient of procedures and has already been paroled.

Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381, involved a conviction and sentence for income tax fraud.

"A part of the evidence on which the conviction rested consisted of documents and oral statements obtained from peti-tioner by a government agent while pe-titioner was in jail serving a state sentence. Before eliciting this information, the gov-ernment agent did not warn petitioner that any evidence he gave the Government could be used against him, and that he had a right to remain silent if he desired as well as a right to the presence of counsel and that if he was unable to afford counsel one would be appointed for him. * * *

"There can be no doubt that the docu-ments and oral statements given by peti-tioner to the government agent and used against him were strongly incriminating. * * *"

On the basis of Miranda the court said:

"The courts below were wrong in per-mitting the introduction of petitioner's self-incriminating evidence given without warn-

ing of his right to be silent and right to counsel."

Mr. Justice White, with whom Mr. Justice Harlan and Mr. Justice Stewart joined, thought the case was outside the scope of the Miranda rules.

We think the case before us is also beyond the scope of those rules.

Mathis was convicted on the basis of the in-custody interrogation and for the acts about which he was questioned. He received two thirty months concurrent sentences for the specific acts about which he was questioned.

■■■ In the case at bar defendant could not be convicted of any of the specific offenses mentioned in Officer Meikle's testimony on the strength of his testimony. Assuming, arguendo, that his testimony would be inadmissible in such a trial it does not follow that its admission here caused reversible error.

It is not the same kind of case. The issues are not the same. The result sought is entirely different.

IX. Defendant challenges Dr. Hege's testimony relative to his findings resulting from a judicially prescribed examination of defendant as in-custody interrogation and inadmissible.

Code section 225A.10 provides: "At the final hearing, the examining physicians appointed or designated by the court may testify as to their examination or examinations of the person charged and the results thereof, but their report or reports filed in court as herein provided shall not be admissible in evidence against the person charged. Evidence of past acts of sexual deviation by the person charged shall be admissible at the hearing."

The meaning of this statute is self-evident.

■■■ A court ordered pretrial psychological or psychiatric evaluation, for which provision is made in Code chapter 225A, is not accusatorial in nature. It does not constitute the type of "in-custody" interrogation proscribed by Miranda. On the contrary, the purpose is to ascertain the mental and emotional condition of the subject, leading to possible treatment, as opposed to punishment. People v. English, 31 Ill.2d 301, 201 N.E.2d 455; United States v. Albright (4 Cir.), 388 F.2d 719, 723–726; State v. Madary, supra, and Annos. 32 A.L.R.2d 434, 444.

■■■ X. A sexual psychopath trial proceeding should not be categorized as a criminal prosecution.

This is of some importance because defendant contends trial court erred with regard to the quantum of proof necessary to support an affirmative verdict.

By instructions 4 and 9 the jury was told, in effect, if plaintiff established all specified statutory elements by a "preponderance of the evidence" then the verdict will be for plaintiff, otherwise for defendant.

Defendant claims plaintiff should have been required to prove essential elements "beyond a reasonable doubt". He cites no authorities squarely so holding.

To the contrary is Sas v. State of Maryland (4 Cir.), 334 F.2d 506, 511, where the court held, in a defective delinquency determination hearing, comparable in material respects to an Iowa criminal sexual psychopath trial, the burden imposed is to establish existence of the alleged condition by a preponderance of the evidence, not beyond a reasonable doubt.

In a sexual psychopath proceeding the issue to be resolved by the trier of the facts is not guilt or innocence of some crime specifically charged. Rather it is whether a designated person is or is not so mentally or emotionally disturbed that he has criminal propensities toward the commission of sex offenses.

The situation is comparable to proceedings under Code chapter 783 to determine mental status of an accused in a criminal case.

State v. Drosos, 253 Iowa 1152, 1156, 114 N.W.2d 526, holds a defendant, claiming insanity, is required to prove existence of the condition only by a preponderance of the evidence. The rule in Drosos should be equally applicable in the case at bar.

Also, as applied to chapter 225A proceedings, there is no apparent compelling cause to find the "preponderance of evidence" standard offends some principle of justice so rooted in tradition and conscience of the people as to be termed fundamental. See in this regard Leland v. Oregon, 343 U.S. 790, 798–799, 72 S.Ct. 1002, 1007, 96 L.Ed. 1302.

█ Plaintiff, in a proceeding under Code chapter 225A, is required to establish the case against defendant by a preponderance of the evidence, not beyond a reasonable doubt.

XI. During oral argument before this court we were advised by counsel for both parties that subsequent to taking of appeal defendant had been released on probation from the mental institution to which committed.

█ The question at once presented is whether this case is moot. We do not so find.

The questions here presented should be resolved. See Board of Directors Ind. Sch. Dist. of Waterloo v. Green, 259 Iowa 1260, 1264–1265, 147 N.W.2d 854.

Defendant's appeal has been accordingly entertained.

XII. Defendant has been treated kindly. If the treatment he has been afforded is successful he may have been saved from a lifetime in prison. He has had a fair trial.

In Wright v. United States, 389 F.2d 996 (8th Cir.), this appears:

"Not every error occurring in the course of a trial requires a reversal. Rule 52(a), Fed.R.Crim.P., provides that errors which do not affect substantive rights shall be disregarded. If upon the record as a whole, the reviewing court is certain that the asserted error did not influence the jury or had but slight effect, the verdict and judgment shall stand. [Citations]"

The case is

Affirmed.

GARFIELD, C. J., and LARSON, MOORE and LeGRAND, JJ., concur.

RAWLINGS, STUART, MASON and BECKER, JJ., dissent.

RAWLINGS, Justice (dissenting).

During trial of this case, Detective Leland Meikle was permitted to testify regarding certain inculpatory statements made to him by defendant in the course of a pretrial interrogation. Defendant interposed timely objections to the effect he was restrained of his liberty at time of questioning, and not given some of the constitutionally required prefatory Miranda warnings.

The majority finds no error in permitting introduction of this challenged testimony.

I submit the majority, in so finding, ignores certain well established applicable principles heretofore clearly enunciated by the United States Supreme Court. I therefore dissent from divisions V, VI, VII, VIII and IX of the majority opinion.

I. Historically various courts have adopted differing positions as to the nature of sexual psychopath trials, many being understandably based upon precedent alone. Some have said they are civil in nature. See Wilson v. Blabon (9 Cir.), 370 F.2d 997, 1001; People v. Levy, 151 Cal. App.2d 460, 311 P.2d 897, 899; and Director of Patuxent Institution v. Daniels, 243 Md. 16, 221 A.2d 397, 409–411. Others

say, though classified as civil, they more closely resemble criminal prosecutions in many critical respects. See People v. Abney, 90 Ill.App.2d 235, 232 N.E.2d 784, 786.

Code section 225A.9 states in relevant part: "The action shall be tried as a special proceeding * * *."

In Smith v. Bennett, the United States Supreme Court, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39, dealing with habeas corpus as a "special" proceeding, said, loc. cit., 365 U.S. 712, 81 S.Ct. 897: "We shall not quibble as to whether * * * it be called a civil or criminal action * * *."

Accordingly we should look not so much to statutory label as to the effect and ultimate result of any jury verdict finding a defendant to be a criminal sexual psychopath. See in this regard The Mentally Disabled and the Law, by Lindman and McIntyre, pages 308–309.

The majority rigidly limits Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 2d 527, to juvenile proceedings. However, I cannot escape the conclusion, some cogent and persuasive constitutional pronouncements in Gault are unavoidably applicable in the case at bar.

At the outset this relevant statement appears in Gault, at 387 U.S. 49–50, 87 S.Ct. 1455–1456: "In the first place, *juvenile proceedings to determine 'delinquency',* which may lead to commitment to a state institution, *must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings. * * * For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil'.* And our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty—a

command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom." (Emphasis supplied.) See also Kent v. United States, 383 U.S. 541, 554–556, 86 S.Ct. 1045, 1054, 1055, 16 L.Ed.2d 84, and 17 Drake L.Rev. 53.

Heryford v. Parker, 10 Cir., 396 F.2d 393, involved commitment of a mentally deficient person, not afforded benefit of legal counsel at hearing. In holding this to be a denial of due process the court stated at 396 F.2d 396: " * * * like Gault, and of utmost importance, we have a situation in which the liberty of an individual is at stake, and we think the reasoning in Gault emphatically applies. It matters not whether the proceedings be labeled 'civil' or 'criminal' or whether the subject matter be mental instability or juvenile delinquency. It is the likelihood of involuntary incarceration—whether for punishment as an adult for a crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or mental incompetent—which commands observance of the constitutional safeguards of due process. Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process, * * *."

The Colorado Sex Offender's Act was found unconstitutional in Specht v. Patterson, 386 U.S 605, 87 S.Ct. 1209, 18 L. Ed.2d 326, and the court there stated, loc. cit., 386 U.S. 608, 87 S.Ct. 1211: *"These commitment proceedings whether denominated civil or criminal are subject both to the Equal Protection Clause of the Fourteenth Amendment as we held in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620, and to the Due Process Clause."* (Emphasis supplied.)

The foregoing pronouncements bear directly on the case before us. It is immaterial that Scheetz has not been convicted of any crime. Nor is his commitment to

an institution designated a hospital rather than a penal institution of any special significance. The argument that defendant has not been formally convicted of a crime is no more persuasive than that advanced in Gault, supra, to the effect a juvenile is only adjudged "delinquent".

We cannot avoid the serious consequences of our criminal sexual psychopath proceedings simply by designating them as "special". Defendant has been adjudged a criminal sexual psychopath and committed to a mental institution for an indefinite period. Labels cannot obscure the relatively harsh nature of such a commitment, preliminarily foundationed upon the filing of a criminal charge. Code section 225A.1. Whether denominated "special" or otherwise, the proceedings with which we are here concerned demonstrably resulted in a deprivation of liberty, and were clearly subject to the due process clause of the United States Constitution. See Specht v. Patterson, 386 U.S. 605, 608, 87 S.Ct. 1209, 1211, 18 L.Ed.2d 326; Griffin v. State of California, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106; and People v. Olmstead, 32 Ill.2d 306, 205 N.E.2d 625, 627.

Referring again to Specht, supra, loc. cit., 386 U.S. 610, 87 S.Ct. 1212, the Court said: "Due process, * * * requires that he [defendant] be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed." See also Sims v. State of Georgia, 385 U.S. 538, 544, 87 S. Ct. 639, 643, 17 L.Ed.2d 593.

By virtue of all that has heretofore been said it becomes evident the constitutional requirements of due process, with attendant rights under Amendment 5, must be accorded a person charged under our sexual psychopath law, regardless of any label applied to such trial proceedings.

II. Plaintiff concedes Leland Meikle, a Cedar Rapids Detective, contacted defendant Scheetz and requested he come to the police station for a discussion relative to a series of attacks on women in that community.

Called as a witness for the prosecution this officer stated he began questioning defendant about 6:00 P.M., January 30, 1966, after having advised him of his rights to telephone and have an attorney present, and "anything he said would be strictly voluntary", and "he didn't have to tell me anything unless he wanted to."

However, on "voir dire" by defendant's counsel, Meikle admitted defendant was never told that in the event he could not afford an attorney the court would appoint one for him.

Defendant made timely and adequate objections to any interrogation-obtained-evidence by Detective Meikle, based upon insufficiency of pre-interrogation warnings given, in that defendant was not advised that in the event of financial inability on his part to engage the services of an attorney the court would appoint one to represent him.

Dealing with that subject the United States Supreme Court said in Miranda v. Arizona, 384 U.S. 436, 478–479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694: " * * * *we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.* Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. *He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.* Op-

portunity to exercise these rights must be afforded to him throughout the interrogation. *After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights* and agree to answer questions or make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him."* (Emphasis supplied.) With regard to the foregoing see also Jackson v. Denno, 378 U.S. 368, 380–389, 84 S.Ct. 1774, 1783–1787, 12 L.Ed.2d 908, 1 A.L.R.3d 1205; Carnley v. Cochran, 369 U.S. 506, 507–513, 82 S.Ct. 884, 885–889, 8 L.Ed.2d 70; State v. Holland, 258 Iowa 206, 214–215, 138 N.W.2d 86; and Carpentier v. Lainson, 248 Iowa 1275, 1279–1280, 84 N.W.2d 32, 71 A.L.R.2d 1151.

At this point the time element involved must be considered. Defendant was questioned January 30, 1966; the Miranda opinion appeared June 13, 1966; and trial commenced April 12, 1967.

This would indicate, at first glance, Miranda was not here applicable, but Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, discloses otherwise. There the court held, in pertinent part, the aforesaid pre-interrogation warning requirements apply to trials commenced subsequent to June 13, 1966. And, as previously noted, trial of the instant case began April 12, 1967.

The record in the case at hand discloses Officer Meikle did not question Scheetz as a known preface to any sexual psychopath proceedings, it being his purpose to interrogate defendant regarding reported criminal activities. But that again is a matter of no consequence.

In Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381, the defendant, in custody on a criminal charge, was questioned by an Internal Revenue officer, absent any Miranda warnings, relative to income tax matters then being inquired into. Later the government contended the questions asked by its agent were part of a routine tax investigation where no criminal action might even be brought, and the interrogated party had not been incarcerated by the questioning officer. These arguments were held to be devoid of merit with this statement, loc. cit., 391 U.S. 4, 88 S.Ct. 1505: "It is true that a *'routine tax investigation'* may be initiated for the purpose of a civil action rather than criminal prosecution. To this extent tax investigations differ from investigations of murder, robbery, and other crimes. But *tax investigations frequently lead to criminal prosecutions,* just as the one here did. In fact, the last visit of the revenue agent to the jail to question petitioner took place only eight days before the full-fledged criminal investigation concededly began. And as the investigating revenue agent was compelled to admit, there was always the possibility during his investigation that his work would end up in a criminal prosecution. We reject the contention that tax investigations are immune from the Miranda requirements for warnings to be given a person in custody.

*"The Government also seeks to narrow the scope of the Miranda holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the Miranda decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the Miranda opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody."* (Emphasis supplied.)

As applied to the instant case, Mathis means the fact that Officer Meikle was testifying in this sexual psychopath proceeding, rather than in the prosecution of a criminal action, makes no difference. A suspect in custody, interrogated with reference to possible criminal charges, has Fifth Amendment rights, and any evidence ob-

tained in violation therof is equally inadmissible when offered in the trial of a case other than that which motivated the original interrogation. See also United States v. Dickerson, D.C., 291 F.Supp. 633.

Meaningful support is afforded the foregoing conclusion by this pertinent statement in Miranda, supra, loc. cit., 384 U.S. 467, 86 S.Ct. 1624: "Today, then, there can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves."

Even more specifically the court stated in Gault, supra, at 387 U.S. 47–48, 87 S.Ct. 1454: "It would indeed be surprising if the privilege against self-incrimination were available to hardened criminals but not to children. The language of the Fifth Amendment, applicable to the States by operation of the Fourteenth Amendment, is unequivocal and without exception. And the scope of the privilege is comprehensive. As Mr. Justice White, concurring, stated in Murphy v. Waterfront Commission, 378 U.S. 52, 94, 84 S.Ct. 1594, at 1611, 12 L.Ed. 2d 678 (1964):

" 'The privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory. * * * it protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used.' (Emphasis supplied.)" See also Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) and McCarthy v. Arndstein, 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924).

Of special import is People v. Capoldi, 10 Ill.2d 261, 139 N.E.2d 776, which deals with a case brought under the Illinois Criminal Sexual Psychopath Act, and the court informatively stated at 139 N.E.2d 779: "Over defendant's objections the [trial] court admitted into evidence two statements signed by him in 1936, following the murder of the five-year-old girl. He contends they are confessions which should not have been admitted in this proceeding without a preliminary hearing as to their voluntariness. Each of the statements is in the form of answers to questions propounded to defendant while in the custody of police, and relate in full detail the commission of a revolting sex murder. Had they been offered in a prosecution for the murder there could be no question of their character as confessions. In such cases the burden is always on the State to prove * * * the purported confession is free from the taint of unreliability because of promises, intimidation or coercion. (Case cited.) The rule that the use of involuntary confessions at a criminal trial violates due process of law and that the State must prove, at a hearing out of the jury's presence, the confession to have been voluntarily made, is so well established that citation of authority is unnecessary. The State argues, however, that the present proceeding is not a criminal case, and that the statements were not admitted in their character as confessions but merely as admissions against interest.

*"Insofar as the present requirements of due process are concerned, it is of little significance that the proceedings are civil in nature. A defendant found to be a sexually dangerous person under the Act is deprived of his liberty as a consequence, and must be accorded the protections of due process in his trial. We conclude that in proceedings under the act, as well as in trials for criminal offenses, the admission of statements which are in the nature of confessions requires preliminary proof of their voluntary character. We also think the statements in question here, while they are not in terms admissions or confessions that defendant is a sexually dangerous person, must be regarded as such for the purposes of the present requirement."* (Emphasis supplied.)

I would accordingly hold the fundamental principle proclaimed in Miranda v. Arizona, supra, must be accorded full recognition in

the trial of any party informed against under chapter 225A, Code, 1966, and was applicable as to the testimony of Detective Meikle in the sexual psychopath trial of defendant Scheetz.

III. But plaintiff argues defendant was not in custody at time of questioning by the police officer. Accordingly we must look to all the circumstances attendant upon the interrogation process. See Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 1153–1154, 20 L.Ed.2d 77.

As disclosed by the majority opinion, Scheetz appeared at the police station pursuant to a request previously made. And according to the record he was there questioned by Meikle for at least an hour and a half, as a result of which self-incriminatory statements were obtained.

The majority quotes at length a portion of Officer Meikle's testimony regarding his questioning of defendant, but in so doing overlooks some questions and answers given by this officer, found in the trial transcript which is before us. I refer to the following:

"Q. Officer, let me direct your attention to the date of January 30, 1966. Were you employed as a detective for the Cedar Rapids Police Department at that time? A. Yes, sir, I was.

"Q. And did you have cause to make any investigation into any incidents regarding Oscar William Scheetz, Jr.? A. Yes, I did.

"Q. Can you tell us—let me direct your attention to approximately seven-thirty p. m. on the date of January 30, 1966. Did you have an opportunity to discuss and question Oscar William Scheetz, Jr.? A. Yes, sir, I did.

"Q. All right. A. He came into the station at about six p. m. that same evening as I had asked him to do and *I talked to him in relationship to a number of assaults that had taken place in the city and during that period of time he had been identified* *by two witnesses—complaining witnesses as the man who had approached them on the street* and as you state, about seven-thirty, I began typing a statement of his admissions to those assaults." (Emphasis supplied.)

This alone serves to disclose, when Detective Meikle asked that Scheetz come to the police station the officer then had substantial reason to believe defendant was a prime suspect in the matters to be discussed. From this it reasonably follows, any investigation pursued by Meikle had focused on defendant at the time he was invited to report at the station. As a result that entire interrogation process was accusatory in nature. See Escobedo v. Illinois, 378 U.S. 478, 484–486, 84 S.Ct. 1758, 1761–1762, 12 L.Ed.2d 977.

Moreover, after defendant, "had been identified by two witnesses—complaining witnesses as the man who had approached them on the street", *Meikle had probable cause to arrest.* It must also be presumed he would perform his duty and effect that arrest. Any other holding would permit an unbridled frustration of Miranda's commands.

Considering now the matter of in-custody-inquiries, the court said in Miranda v. Arizona, supra, at page 444, 384 U.S., page 1612, 86 S.Ct.: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

Unquestionably Scheetz was subjected to an invited police station interrogation, which in turn means it was initiated by Officer Meikle.

Upon the basis of the record before us it cannot be said defendant was under "arrest" in the strict or legal sense of that term when he entered the station. On the other hand the matter of deprivation of his freedom of action in any significant manner is a factor which must be considered.

Initially I refer to this statement in People v. Gioviannini, Cal.App., 67 Cal. Rptr. 303, 310: "It is not necessary for a person to be under arrest for him to be in custody. Even one who comes to a police station voluntarily may be regarded as in custody. (Cases cited)."

Myers v. State of Maryland, 3 Md.App. 534, 240 A.2d 288, involved a factual situation similar to that presented in the case with which we are here concerned. There, police officers in a squad car observed a suspect walking along a street. The policemen stopped and told the subject they wanted to talk to him, whereupon he entered the automobile. Without giving those warnings postulated by Miranda, the officers questioned the suspect and he orally confessed commission of a crime. That confession was held inadmissible in evidence, on trial, with this pertinent statement, loc. cit., 240 A.2d 291: " * * * the questioning of the appellant by the police officers in their police vehicle constituted a 'custodial interrogation' within the ambit of the Miranda decision. As heretofore indicated, the appellant was the prime suspect in a murder case and the police had undertaken to find him. Once located, he was suddenly taken from the public street, and placed in a police car with two officers who interrogated him about the crime as the car moved toward police headquarters. That appellant was not free to leave the officers is wholly evident from the record, and we think 'the atmosphere' thus created was such as carried 'its own badge of intimidation.' See Miranda, 384 U.S. at page 457, 86 S.Ct. 1602. We conclude that appellant's interrogation constituted 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way,' squarely within Miranda's meaning, and consequently we hold that the lower court erred in admitting appellant's oral confession in evidence against him."

Another case dealing with the issue at hand is Seals v. United States, 117 U.S. App.D.C. 79, 325 F.2d 1006. There Seals, walking along the street, was approached by FBI agents cruising in an automobile. They stopped and asked if he would come to the car, stating that they wanted to talk to him. He complied and entered the vehicle. The officers then drove a few blocks away, stopped the car and started talking to Seals. From there the party went to Seals' apartment where there was more talk. They then went to the FBI downtown office. Seals was then told he did not have to talk, had a right to consult a lawyer before talking, but if he did talk anything said could be used against him in court, and he was free to leave. Defendant then confessed the commission of a crime.

In course of trial the judge found, as the result of a "voir dire" examination, Seals was not under arrest prior to the confession.

On appeal the reviewing court reversed and in so doing stated at 325 F.2d 1008–1009: "Viewing the evidence in the light most favorable to the Government, and giving the court's finding the great weight to which it is entitled, we must nevertheless conclude that Seals was under arrest at least from the time (about 4:30 p. m.) he was brought to the Field Office in the company of the agents. Such a conclusion seems to us well nigh irresistible. By that time, Seals 'would have been rash indeed to suppose he was not under arrest,' Kelley v. United States, 111 U.S. App.D.C. 396, 398, 298 F.2d 310, 312 (1961). From that point on he was in what was the equivalent of a police station, he was in the constant company of one or more FBI agents, and was subjected to almost constant interrogation. It seems to us these circumstances dictate a finding that even without any physical restraint Seals necessarily must have understood that he was in the power and custody of the FBI and that he submitted to questioning in consequence. As we held in Coleman v. United States, 111 U.S.App.D.C. 210, 218, 295 F.2d 555, 563 (en banc 1961), this

would constitute arrest, even though no actual force or visible physical restraint was used, or any formal declaration of arrest made. The fact that Seals was told that he was free to leave and that he was not under arrest would hardly in the circumstances in which he found himself—never left alone and constantly in the company of FBI agents in their offices (observed by him to be difficult of access and presumably thought to be difficult of exit) —suggest to him, a 19-year old high school student, that he was in fact free."

Also in point is United States v. Harrison, D.C., 265 F.Supp. 660. In that case police officers suggested a party accompany them to the station house for questioning relative to his possible involvement in violation of narcotics laws. He complied, and at police headquarters, absent the Miranda warnings, made certain incriminatory statements relative to possession of wagering materials, later subjected to a motion to suppress. In upholding that motion the court said at 265 F.Supp. 662: "The government's contention that the statement was properly taken and the wagering materials were legally seized breaks down into two major premises. First, it is said that Harrison voluntarily appeared in the station house and submitted to questioning. Second, the prosecution urges that information gleaned largely, if not entirely, from the interview engendered 'probable cause' for the officers' search of Harrison's store. Unfortunately, I am unconvinced by the first premise or argument; rather, I find that the totality of circumstances as stated in the prosecution's version of what transpired at the station house amounted to 'custodial interrogation', as that term is defined in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)."

Actually, the word "custody" defies any precise definition. It depends more upon the environmental situation in which a person is placed, by reason of which he may have cause to believe his freedom of movement is or will be restricted by official authority, than on the subjective intent of the interrogator.

In this respect, one of the vices attendant upon custodial interrogation which Miranda and Escobedo condemn is that which lies in the psychological coercion implicit in any isolated questioning, with the resultant effect an individual may reasonably believe he is not at liberty to leave. Under such circumstances a party being interrogated finds himself deprived of freedom of movement. Lacking knowledge of his constitutional rights he may understandably feel he can best avoid implication or absolve himself only by submitting to interrogation; that silence will be nothing short of self-incrimination. He may also reasonably believe any attempt to leave will have the same result, and will further serve to provoke immediate isolatable detention.

With regard to the foregoing the court said in Miranda v. Arizona, supra, loc. cit., 384 U.S. 461, 86 S.Ct. 1620–1621: *"We are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion * * * cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery."* (Emphasis supplied.)

A consideration of all circumstances attendant upon the police station interrogation of Scheetz leads to no other conclusion than that he, being a prime suspect, was then and there deprived of his freedom in a significant manner by official authority. In support hereof see also

Orozco v. Texas, 394 U.S. ——, 89 S.Ct. 1095, 22 L.Ed.2d 311, opinion filed March 25, 1969; United States v. Gower, (M.D. Penn.), 271 F.Supp. 655, 660–661; People v. Hazel, 252 Cal.App.2d 412, 60 Cal.Rptr. 437, 440–441; People v. P. Rodney, 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255; and Annos. 10 A.L.R.3d 1054.

Moreover, the record, quoted by the majority, discloses Detective Meikle, in testifying as a witness for plaintiff, related in detail the interrogation-obtained damaging statements and admissions made to him by defendant.

I would resultantly hold, with regard to custodial questioning by Meikle, defendant was entitled to all pre-interrogation warnings prescribed by Miranda, some of which were not given, and upon the basis of authorities cited, supra, trial court erred in overruling defendant's objections to the evidence of this police officer relative to in-custody admissions or confessions obtained by him from defendant.

Additionally, the erroneous admission of any or all such evidence, even in the presence of other testimony which might alone be sufficient to sustain a verdict finding defendant to be a criminal sexual psychopath, clearly constitutes reversible error. Supporting this principle is Estes v. Texas, 381 U.S. 532, 562–563, 85 S.Ct. 1628, 1643, 14 L.Ed.2d 543, where the court held, if an involuntary confession is introduced into evidence, over objection, at a state trial, the conviction must be reversed even though there is other evidence in the record to justify a guilty verdict.

IV. Additionally Division IX of the majority opinion contains this statement: *"Defendant challenges Dr. Hege's testimony* relative to his findings resulting from a judicially prescribed examination of defendant *as in-custody interrogation and inadmissible."*

I do not find that allegation among defendant's assigned errors and note the majority does not list it among those relied on for reversal.

As best I can determine no issue is here presented relative to constitutional admissibility in evidence of inculpatory or exculpatory statements made by defendant to the psychiatrist in course of the court ordered psychiatric examination.

Under these circumstances any determination of that issue should be withheld until it is squarely presented, briefed and argued to this court. This is in keeping with the rule that where a question is not presented for determination by trial court, nor assigned as an error or a proposition relied on for reversal, it will not be considered on appeal. See B-W Acceptance Corp. v. Saluri, 258 Iowa 489, 499, 139 N.W.2d 399; and Bryan v. Iowa State Highway Commission, 251 Iowa 1093, 1095–1096, 104 N.W.2d 562.

I submit, absent an adversary presentation, any attempt to resolve the problem, here gratuitously injected into the majority opinion, unavoidably compels this court to adopt the position of an advocate. This is demonstrated by the divergent views expressed in People v. Garcia, Cal.App., 74 Cal.Rptr. 103; People v. Potter, 85 Ill.App.2d 151, 228 N.E.2d 238; State v. Obstein, 52 N.J. 516, 247 A.2d 5; and State v. Whitlow, 45 N.J. 3, 210 A.2d 763.

V. By reason of the conclusions set forth in Divisions I, II and III of this dissent, I would reverse and remand for a new trial.

MASON and BECKER, JJ., join in this dissent.

STUART, J., joins in all but Division III of this dissent.